Taliaferro, J.
Before proceeding to give my opinion upon such of the questions adjourned to this Court, as I think should be answered, I deem it not improper to state that there is a fact, purporting to be a part of the verdict, stated in the record, which I do not feel at liberty to consider as such. After the special verdict was returned and the jury discharged, when the Court, not advised what judgment to render, took time to consider, on another day the prisoners were again set to the bar, and thereupon informed by the Court, “ that a fact essential to the decision of the questions intended to be made by the special verdict was omitted in said verdict, and unless they would agree such fact, the Court had determined to set aside the said verdict and award a venire de novo.” Thereupon the prisoners agreed that the following fact, being the fact required, might be added to the verdict, to wit: “ That if the of- *662 fences set forth in the special verdict found in these cases were committed in any county of Virginia, they were committed in the county of Wood.”
The prisoners in my opinion were entitled to demand the judgment of the Court upon the verdict of the jury, to which the Court could add nothing. And notwithstanding the character of the offence charged against the prisoners, would not only justify but demand of the Court no relaxation of the law’s utmost rigour, yet I am not aware that the prisoners could be put under rule to allow an addition to the verdict, on pain of having the verdict set aside, and a new trial awarded, as I have not found any case of felony in which the Court has awarded a new trial against the accused.
The fifth and last question adjourned, requires an examination of the verdict, independent of the other questions ; and in the view I have taken, renders an answer to them unnecessary to the case of the prisoners. This is a special verdict, and the Court can supply no defect in the finding. Every circumstance constituting the of-fence must be found, to enable the Court to give judgment. For the Court cannot supply any defect in the statement made by the jury on the record, by any intendment or implication whatever. And, therefore, where the indictment set forth that the defendant discharged a gun against the deceased and thereby gave him a mortal wound, and the jury only stated that he discharged a gun and thereby killed him, omitting that it was against him, although from the other circumstances stated, that averment was amply supplied to common sense, it was adjudged that the Court could not give any judgment against the prisoner. 2 Chitty’s Crim. Law 644, and the authorities cited. The jury do not find that the prisoners enticed, advised or persuaded ; nor that they carried or caused the slaves to be carried out of the State; nor that they knew that the slaves were runaway slaves. The jury find that the slaves *663 crossed the river to the Ohio shore opposite where the prisoners were concealed, (no doubt expecting their arrival,) and that the slaves followed the prisoners along the beach of the river; the prisoners having aided them in unloading the canoe. Prom this fact the jury might well have been justified in finding the fact, that the prisoners knerv them to be slaves and runaways; or that there had been a previously concerted plan between the prisoners and the slaves, that they should runaway from their master, and that the prisoners would carry them out of the State. But this the jury do not find; they leave these facts to be inferred.
In the absence, then, of a finding of these facts, as the Court can add nothing whatever by intendment or implication to the statement made by the jury on the record, however the Court may be satisfied, (as I am,) that the prisoners were seeking feloniously to deprive Harwood of his property, I am of opinion that for this reason, without reference to the other questions adjourned, this Court, in answer to the fifth question, should advise the Circuit Court of Wood county to pronounce judgment for the prisoners.
This point was not raised at the bar. The argument was confined chiefly to the questions of the boundary and jurisdiction of this Slate.
The special verdict presents for the first time, within my knowledge, for judicial decision in our Courts, the question of the extent of the territorial limits of Virginia on the northwest. I should not in the view already taken, deem it necessary to investigate that question, if it were not directly propounded by the Circuit Court of Wood; if in addition it was not directly presented by the record; and if the able and elaborate discussion here, and the public interest taken in it, in connection with the case of the prisoners, did not demand it. The question presented is, do the territorial limits of Virginia extend beyond the Ohio river on the northwest ?
*664 The prisoners were citizens of the State of Ohio. They came down to the water’s edge ; stepped into the water at the bow of the canoe ; the canoe fastened at . the time to the Ohio bank of the river, (the bow being run up on the beach,) and aided the slaves of Harwood in unloading the canoe. They were standing on the ground in the water, on the Ohio side of the low water mark of the Ohio river. This fact presents the question, whether the soil on which they stood is the soil of Virginia. I understood the counsel of the prisoners to say, (speaking as though he spoke for the State of Ohio.) that it never was. This will justify me in investigating the right of Ohio, to deny the title of this State, through which I understand her to derive her title. The counsel said, that though the State of Ohio, in this case, was willing to recognize the authority of Handley’s lessee v. Anthony, 5 Wheat. R. 374, yet, when occasion should arise, she would contend for the filum medium aquce, notwithstanding that case, as the boundary. If in fact, Virginia never had title beyond the Ohio river, then it would be unnecessary to proceed further. I do not consider that an open question for the Courts of this State. Virginia has too repeatedly and solemnly asserted her title, to allow her Courts now to contradict it. Not then considering myself at liberty to go behind her deed of eession, I yet do not think it would be found a task of very great difficulty to establish a title, claimed and held by her from the earliest days of her colonial history, and only parted with by her free grant for the common good by one of the highest acts of her sovereign power. On this view, I assume that prior to the act passed December 20th, 1783, to authorize the delegates of this State in Congress, to convey to the United States in Congress assembled, all the right of this Commonwealth to the territory northwest of the Ohio river, and the deed of the commissioners made in pursuance thereof, this State was not only the owner of the Ohio river, but *665 also of the territory on its northwestern shores. This State claimed to be and was the exclusive owner. This is not only proved by her other acts in respect to it, but is manifested from the recitals of her act of cession ; amongst which is “ the full confidence that Congress will, in justice to the State, for the liberal cession she hath made, earnestly press upon other States claiming large tracts of waste and uncultivated territory, the propriety of making cessions equally liberal, for the common benefit and support of the Union ; whereby she declared her exclusive right, which she ceded away, upon the confidence that the other States, after she had made such liberal cessions for the common benefit and support of the Union, would, on their part, make cessions equally liberal of their claims to other territory for the same patriotic purpose. This cession was accepted by the States in Congress assembled, with these declarations of this State on its face. And without referring to the well known fact that many of the States then claimed large tracts of other waste and uncultivated territory, could they afterwards be said to have justified the generous confidence of Virginia, by a release only of claims on their part to the same territory : of claims which this State, so far from ever having admitted at any time, at all times denied and reprobated : when too, such release could, in no sense have been a cession for the support of the Union in the sense in which Virginia ceded her territory, but at most, only a removal of causes of possible controversy. If, however, the States or either of them, after accepting the cession of this State, could then set up any several claim in opposition to the title of the United States, acquired by the cession, which I by no means admit, certainly the Stale of Ohio could not. If the States accepting the cession, subsequently opposed any title that Virginia having claimed had ceded away, their claim would not be set up against Virginia, but against the title of the United *666 States acquired from Yirginia: that is, against the right of the United States to a territory acquired by them by the cession of one of the States, and afterwards held by the United, States against all, for the common benefit and support of the Union. Strong as this proposition seems to me to be against the right of any of the States accepting the cession of this State, after-wards to set up a title in opposition, stronger, and, indeed, conclusive is it against any such pretension on the part of Ohio. She was not at that time a State. Her political existence as a State dates from her admission into the Union in 1802. Before that period her people inhabited one of the territories of the United States : a territory the proprietors of which, (the United States,) admitted to be bounded on the southeast by the Ohio river: the State from which they derived their title, having ceded only the “ territory or tract of country within the limits of the Yirginia charter, situate, lying and being to the northwest of the Ohio riverand holding every thing on this side of the tract of country described “ as the country lying and being to the northwest of that river.” To the northwest of this line the United States had title, and to nothing southeast thereof. They could not extend their boundaries southeast of that line, and in fact never even attempted to do so. How then could the State of Ohio, deriving her territory from the United States, do what they could not ? The conclusive and binding effect of the deed of cession upon Ohio could be further strengthened, if it were necessary, by the reservations of Yirginia of lands within her 'boundaries and recognized by Ohio, to satisfy the obligations of the State to Gen. Clark and his regiment, and the Yirginia troops on the continental establishment.
If, however, these facts were not sufficient to sustain the rights of this State to the Ohio river; if the fact that it was within her chartered limits was not enough ; *667 yet by the acknowledged principles of national law the . -i i , , Tr. . . , . . P river would now be hers. Virginia took possession of the river with a view to settle there, when no civilized people held the country beyond. If another nation had settled on the opposite side, still, the long and undisputed possession of this State, aided, if more was required, by her deed of cession, standing quoad hoc as a treaty between her and the United States, would give her the right. Vattel, in chap. ii. p. 120, says, “ that a long and undisputed possession establishes the right of nations; otherwise there would be no peace, no stability between them ; and notorious facts must be admitted to prove the possession. And, finally, if treaties determine any thing on the question, they must be observed. To establish it by accurate and express stipulations is the safest mode.” Such was the mode taken by Virginia in 1783. She established her boundaries on the northwest by accurate and express stipulations stated in her deed, (boundaries acknowledged by the United States,) having claimed title from her earliest history; taking possession and holding the country with a view to settle there. The filum medium aquee would be the boundary of Virginia and Ohio, if they were cotemporary in the occupation of the opposite shores of the river. Virginia, however, owned on both sides; and only ceded away what lay “ to the northwest of the river.”
The Ohio river then does not constitute the boundary between Virginia and Ohio. The boundary of Virginia extends across and includes the river. The country on the northwest is within the State of Ohio; whilst all on the southeast, not of the river, but of the line fixed as northwest of the river, is within the State of Virginia. But the question remains, do the territorial limits of Virginia on the northwest extend only to low water mark of the Ohio river, or to medium water mark; or does it only stop when it reaches the top of the banks of the river ?
*668 By the laws of nations, if the Ohio river was a navigable river within their definition of navigable rivers, low water mark would he the boundary. The reason is too strong and sensible to be now questioned. It is that otherwise there would be a strip of land left by the reflux of the tide cutting off the people on that side from access to and use of the river if owned by the State on the opposite shore. I have not been able after much reflection to find any sufficient reason why the rule should not be adopted and applied to rivers denominated innavigable. To adopt the language of the late Chief Justice, “ the mind will find itself embarrassed with insurmountable difficulty in attempting to draw any other line than the low water mark.” I can find no authority to oppose, whilst it seems to me that every argument, whether drawn from policy or convenience, demands its adoption. The line must be fixed at low or high water mark. No intermediate line can be adopted, unless it is to be for the single reason, that (if capable of being ascertained at all as a local point,) it would be more frequently exposed to view than the low water mark. It is true that on rivers subject to the flux and reflux of the tide, low water mark is a fixed and determinate boundary, exposing itself to view twice every twenty-four hours, whilst elsewhere it is concealed by the waters for uncertain periods; and so, though the boundary is fixed, its precise location might not at all times be distinctly known, in the absence of other indices. This it is said requires a mark more frequently obvious. If this argument is at all sound, it would reduce the question of boundary to a selection between two lines, both frequently covered by water; and require its location upon that most often exposed to view, exclusive of all other considerations. The reason for adopting such a rule, would in fact lose its entire weight when applied to the great waters of the west; upon which it is known, that what is called the medium water mark is for a long space of time in every year *669 covered by the water. The question then is between low and high water mark. This question has been considered and decided in the case of Handley’s lessee v. Anthony, 5 Wheat. R. 374; and after examination, I have yielded it the assent of my mind, not as binding authority upon the boundary of this State, but as a just exposition of the reason for fixing the low water mark as the line of boundary to be applied as well to innavigable as to navigable rivers. I do not propose to review that case. If the late Chief Justice could not place the decision of the Court in that case beyond the reach of criticism, I shall not attempt the vain task of doing what he failed to accomplish. I shall, however, state some of the reasons which have satisfied me that the case was correctly decided.
It seems to be agreed that Virginia owns the river. That it is her domain. That she has the same right to the river that she has to any other land within her borders. Whatever then may be the river is hers. Any land lying on the northwest, constituting part of the river, is as absolutely hers as any and all land lying on this bank: all is subject to her dominion. If the banks of the river constitute part of the river, the banks are hers ; if the shores, they are hers ; not eo nomine ; not as things different from the river, but as the river. For it was contended that all rivers consist of the water, the beds and the banks. Now I do not deem it necessary to perplex this question by asking if one standing on the bank of a river can be said to be standing in the river ? Or to have my own view of it embarrassed by the question, whether a man standing in the water can be said not to be in the river ? Such questions do not aid the investigation ; but founded upon popular forms of expression, rather embarrass it. I shall attempt rather to avoid such questions by looking beyond them. It is admitted that the State of Ohio extends to the Ohio river ; and her boundary in that direction may be *670 better ascertained by enquiring what her rights are on that account. It will not do to say that it extends only to the banks of the river; for that would be to separate the two, the banks and the river, for that purpose, whilst they are in the next breath declared inseparable, as constituents of one whole, for a different purpose. Vattel B. 1, chap. 22, § 268, says, “ if a territory which terminates on a river has no other boundary than that river, it is one of those territories that have natural or indeterminate bounds, and it enjoys the right of alluvion ¡ that is to say, every gradual increase of soil, every addition that the current of the river may make to its banks on that side, is an addition to that territory, stands in the same predicament with it, and belongs to the same owner.” And in the following section he adds : “As soon as it is determined that a river constitutes the boundary line between two territories, whether it remains common to the inhabitants on each of its banks, or whether each shares half of it, or finally, whether it belongs entirely to one of them; their rights in respect to the river are in no wise changed by the alluvion.” Now, the river belongs to Virginia, and Ohio is bounded by it on the southwest. What then are her rights to the alluvion on that side ? If the proposition be true that the banks constitute a part of the river, then Ohio would have no right to alluvion. Her boundary would be fixed at the line to which the banks of the river extended ; and whatever gradual increase of the banks might in the progress of years be made by alluvion, would be an increase of the river, not of the territory of Ohio. I have made these observations to shew that the banks of a river are in legal contemplation different from the river. In the language of Vattel, every gradual increase of soil which the current of the river may make to its banks on that side, is an addition to that territory. It must then, it seems to me, follow, that Ohio enjoys the right of alluvion, and this right brings her territory *671 down the banks, and extends it to the water, increasing , . . . her territory, or lessening its extent, as the river may insensibly recede from or advance upon the one or the Other Side.
This, though, only places the territory of Ohio in connexion with the water, and leaves for investigation the title to the strip of land lying between the ordinary low water mark, and the ordinary high water mark. It would have to be shewn that if the territory, extending on the banks of a river, is ever washed by the river in any state of the water, that thereby such territory would be entitled to alluvion before it could be stopped in its progress across the shore towards the river. I take it to be of the very nature of this right of alluvion to place the territory entitled to it always in connexion with the water. It is an insensible addition or increase to the shores or banks, and fixes in my opinion the permanent river. If it were otherwise, then it would follow that Ohio has on that side, a fixed and determinate boundary, as distinguished from what Vattel calls natural or indeterminate bounds; and must of course, have another boundary than the river.
If this is so, then there is a strip of land lying between low and high water mark, or between low and medium water mark, which belongs to Virginia, or alternates between Virginia and Ohio, as it may be covered by the water, or left bare by its receding.
It cannot, be that Virginia owns it to-day and Ohio to-morrow; that the boundary advances or recedes as the waters swell or abate. The doctrine of movable freeholds can find no application to the dominion of sovereign States to their respective territories. Vattel having explained how a nation takes possession of a country, and at the same time gains possession of the domain and government thereof, says in chap. vii. pp. 164-5-6, “ that country, with every thing included in it, becomes the property of the nation in general, and the *672 full domain is necessarily a peculiar and exclusive right. Sovereigns may have fiefs and other possessions in the territories of another Prince : in these cases they possess them in the manner of private individuals. The sovereignty united to the domain establishes the jurisdiction of the nation in her territories. It is her province to exercise justice in all places under her jurisdiction; to take cognizance of the crimes committed, and the dif- ' ferences that arise in the country.” The shores of the Ohio river I suppose form no exception to this rule.
They do not belong first to one State and then to another ; but to one in exclusion of the other. If they belong to Virginia they are her domain; and Ohio would have no right to them except so far as she might claim the innocent use or incidental advantage to be derived from the river. This is not a perfect right; for it belongs to the owner to judge whether the use we wish to make of a thing that belongs to him will not be attended with damage or inconvenience. If others should presume to decide on the occasion, and in case of refusal to compel the proprietor, he would no longer be master of his own property. This imperfect right is all that Ohio had in the river prior to the compact of this State with Kentucky; and it is all she could have to the shores, if in fact the shores were the domain of Virginia. This condition of things would give to this State the right to grant the shores as part of her domain to any one she may please : would give her the right to say to Ohio you cannot come over them to the river, except as I please, at such times and places as I may think proper to allow. It would cut off that State from the river except at the will of another State; and would thus deprive her of a right of inestimable importance.
It is not supposed to be susceptible of doubt that Virginia could grant the shores, if they are hers. If she could not, then her right is under some other restraints, than her rights over the shores of other rivers within her *673 boundaries. I shall not refer to authority, as it will be found referred to in the opinions of other Judges. That she has not done so, I shall have hereafter occasion to shew, is because she has not thought they belonged to her.
This question of boundary ought not to be decided without the aid of the lights furnished by the acts of the State in respect to it. We are engaged in the construction of her deed, in ascertaining what she meant by the words she used; and her course may furnish much aid in the exposition of her construction of her deed of cession. I am satisfied that this State considered low water mark as her boundary. If she did not, then she must have claimed to be the owner of all the land lying beyond, and between it and the line she may have fixed as her boundary on that side. If she was, it would reasonably be expected that some act could be referred to in the long interval between 1783 and the present time, in which she had exercised dominion over it. So far from this, this State has abstained from the exercise of dominion over it. I have been told that an attempt was made to locate a Virginia land warrant on a part of it, which was resisted and abandoned. Such nonuser for such a space of time, accompanied by acts of dominion by Ohio, would now preclude this State from claiming. It is no answer to this view to say that the land is at best but a small strip often covered by water. The quantity of the land is not the question. It is whether she has any. States, like individuals do not fail to claim their own merely because it is small. The violence of the claim is too frequently in an inverse ratio to the quantity. If it is hers, it is hers in exclusion of all others. Ohio on the contrary, has exercised dominion over it, and continually claimed and held it. Her citizens have projected their wharves into the stream; have put their machinery in communication *674 with the water; have located their cities upon, and connected them with the river.
It does seem to me, that now to fix a different eonstruction upon her deed of cession, would be to do injustice to her character. It is true that crimes deeply offensive to the people and majesty of this State, prompted by a state of feeling I fear unhappily too prevalent across the Ohio river, are charged against the prisoners; and that such occurrences make the State deeply sensible of the consequences which may flow from her liberality and munificence. But yet this ought not to affect this question of boundary. I am sure, indeed, it would not in the least prompt any one of us to advance the boundary one inch beyond his deep convictions of its proper location. We look to the state of things at the date of the deed. Yielding readily aud generously to the recommendations of Congress, Virginia ceded to the United States all her territory to the northwest of the Ohio river, upon condition, principally, “that the territory so ceded shall be laid out and formed into States containing suitable extent of territory; and that the States so formed shall be distinct Republican States, and admitted members of the Federal Union, having the same right of freedom, sovereignty and independence as the other States.” Here is the cession of a vast and valuable territory; the seat of great States since formed out of it, bounded for a great distance on a great river, contemplated and calculated to endure forever; daily and rapidly to advance in wealth and increase in population; to find their way to the markets of the world, upon that river; but to be excluded from all approach and access to its waters, except over the ■territory of Virginia, and only at her will. This could not have been the intention of this State. She bounded the territory on the river and gave to them the shores. Indeed, she has declared this subsequently. By the 7th section of the act concerning the erection of *675 the District of Kentucky into an independent State, it is imposed upon that State, “ that the use and navigation of the river Ohio, so far as the territory of the proposed State, or the territory which may remain within the Commonwealth lies thereon, shall be free and common to the citizens of the United States; and the jurisdiction of this Commonwealth and the proposed State on the river as aforesaid, shall he concurrent only with the States which may possess the opposite shores of the said river.” This is quoted not to remark upon the question of concurrent jurisdiction, but to shew that this State did not claim the opposite shores of the river, but on the contrary, recognized the right of the States on the opposite side of the river, to those shores. Now the shore of the sea is said by Hale, in his Treatise De Jure Maris, as quoted by Kent, to be the land between ordinary high and low water mark. If this definition is to be applied to rivers, then Virginia said that the States across the Ohio possessed or owned the land between ordinary high and low water mark. It is said, however, that this definition applies only to the sea. This State, in a solemn and well considered public act of great importance, in which I take it for granted every word in relation to interests of such great magnitude was well weighed, distinguishes the river from its shores; and recognizes the possession of and right to the shores of the opposite States. Philologists define shores to be “ the coast or land adjacent to the ocean or sea, or to a large lake or river.” They are lands contiguous to the water. I take it for granted that they are always adjacent to the water and thus distinguished from the bed. As in rivers subject to the tide, the shores are the land lying between high and low water mark, so on innavigable rivers, they are the land lying between the permanent river and the extent of overflow when swollen. Can it then be true that the State of Ohio possesses the lands lying adjacent or contiguous to *676 the river, the shores of the river, and yet that the State possesses a strip of land, neither the bank or the shore, and yet lying between the shore and the river.
I again repeat, that I yield my assent to the case of Handley’s lessee v. Anthony et al., and have not thought it necessary to present it in full review. I have felt reluctant from the time I was able to concur with it, to present my own views on the point that was there so ably and fully discussed by the first judicial mind this country has ever produced.
The prisoners were on the Ohio side of low water mark ; and being of opinion that the territorial limits of Virginia do not extend beyond that line, judgment should, I think, on that ground be given for them.
The prisoners were not afloat; they were not in the canoe; they were in the water standing on the ground. I therefore do not think that the fourth question arises in this cause. That question is as to the effect of the compact with Kentucky upon the jurisdiction of this State and the States on the opposite shores over the Ohio river. Those States can only have jurisdiction over things afloat, if at all. The question is a very important one, and I decline stating any opinion, when it does not necessarily arise in the case.
M’Comas, J.
The Judge of the Circuit Superior Court of Law and Chancery for the county of Wood, adjourned to this Court several questions of law, arising from the facts found in the special verdict; all of which are included in the general proposition: Had the Superior Court of Wood jurisdiction to try the offence ? And this, in my opinion, depends upon the question, whether the offence was committed within the territory of Virginia. Whether the offence was committed in Virginia or not, depends upon the just and proper construction of the deed of cession made by Virginia to the United States. But before I proceed to examine the construe *677 tion proper to be put upon the deed of cession, it will * be necessary to notice in a concise manner the objections made by the couusel of Ohio to the claim of Virginia to jurisdiction and territory. Indeed that counsel contended that Virginia had no title to the territory northwest of the Ohio river; nor even to the territory bordering on the Ohio river on the southeast side thereof, previous to the deed of cession. It seems to me to be too late at this day to question Virginia’s title to the said territory.
But if it were an open question, her title was beyond dispute. The territory northwest of the Ohio river was within the acknowledged boundaries of Virginia under the charter of 1609. But it is said the British King had no right to grant such charter, he having no title to the country included in it. It will not be necessary to enquire into the rights of the British King; because no civilized nations had claim to the country except England and France; and by treaty between those two nations, the boundaries were ascertained and fixed between them; and the territory in controversy was acknowledged to be in the English Crown, and of course by that treaty the title of Virginia to the lands contained in her charter, and comprehended in the limits of the British possessions, was confirmed, and thereby made good. The British King by several acts, and particularly by grants of large tracts of land, acknowledged that the northwestern territory was within the jurisdiction and limits of Virginia. No other Colony or State attempted to exercise or extend its jurisdiction or laws over that territory ; neither did the English government, except as a portion of the Colony of Virginia. It follows, therefore, if it were not a part of Virginia, no civilized nation ever extended jurisdiction over it.
But it is stated that the charter of Virginia was annulled, and that she has no right to claim under said charter. It has been decided, and I think rightly, that *678 “ the charter was annulled so far as the rights of the company were concerned, but not in respect to the rights of the Colony. The powers of government, the same powers which the charter had vested in the company as proprietor, were vested in the Crown : the same title to the lands within its chartered limits, which the charter had vested in the company, was revested in the Crown. Virginia, by her declaration of independence, declared that her boundaries should be, with certain exceptions, that of her ancient charter of 1609. Judge Baldwin, in his constitutional views, at page 80, remarks that this guarantee was fulfilled by the treaty of peace, in which his Britannic Majesty acknowledged the United States, to wit, New Hampshire, &c., to be free, sovereign and independent States. This recognition, relating back to the separate or unanimous declarations by the States, has the same effect as if the State had then assumed the same position by previous authority of the King, the treaty not being a grant, but a recognition and subsequent ratification of their pre-existing condition ; and all acts which had declared and defined it previous to the treaty related back to 1776.”
As it appears that the territory in dispute was never within the chartered limits of any other Colony or State, or declared to be so by any State in her declaration of independence either separately or jointly, and as it has been frequently decided that the confederation had acquired no land or territory by the war, it follows that if the territory in dispute were not a part of the territory of Virginia, it did not belong to the United States.
In relation to the territory northwest of the Ohio river, it ought to be recollected that during the revolutionary war, and before the cession, Virginia conquered the territory by her own troops, unaided by the other States of the Union; and formed the whole territory into the county of Illinois. It therefore seems to me, as the territory was not within the chartered limits of any other *679 State, and as it undoubtedly belonged to the British Crown, this conquest would give Virginia an undoubted right to it.
As to the right of Virginia to the territory and dominion extending to the Ohio river, no man could have entertained a serious doubt. Long before the revolutionary war, large grants of land had been made, as within the Colony of Virginia, along the margin of the river; and counties were formed extending to it. At the time of the declaration of independence by Virginia, counties bordering on the Ohio were represented in the Convention that formed the Constitution for the State. No other civilized nation or State extended or pretended to extend jurisdiction over it; but it has always been under the exclusive jurisdiction of Virginia.
It being settled that at the time of the cession Virginia had an undoubted jurisdiction of the territory to the Ohio river, and it being clearly established that if the territory northwest of the river was not within her jurisdiction, it had not been under the control or management of any civilized people, it follows that Virginia was the first occupant of the banks of the Ohio. Now, then, supposing that Virginia, having clear title to the territory southeast of the Ohio river, and no title to any portion of the territory northwest of said river, was yet the first settler: what would be her rights to the river?
In VutteVs Law of Nations, p. 179-80, it is thus laid down : “ When a nation takes possession of a country in order to settle there, it possesses every thing included in it, as lands, lakes, rivers, &c. But it may happen that the country is terminated and separated from another by a river ; in which case it is asked, to whom this river belongs? It is manifest, on principles established in chapter xviii. that it ought to belong to the nation who first took possession of it. This principle cannot be denied ; but the difficulty is to make the application. When a nation takes possession of a country terminated *680 by a river, it is considered also as appropriating the river to itself; for a river is of such great use, that it is to presumed the nation intended to reserve it to itself. Consequently the nation who first established its dominion on one of the banks of the river, is considered as being the first possessor of all that part of the river which terminates its territory.” Virginia, being the first to extend her dominion to the river, is entitled to the whole river, whether she owned territory northwest of it or not. What is included in the term river will hereafter be enquired into.
It being clearly established that Virginia had a right to the territory on both sides of the Ohio river, she by her deed of cession conveyed to the “ United States in Congress assembled, for the benefit of said States, all right, title and claim, as well of soil as jurisdiction, which this Commonwealth hath to the territory or tract of country within the limits of the Virginia charter, situate, lying and being to the northwest of the Ohio river.” This deed of cession must either be construed according to the rules of the common law, or according to the rules of the law of nature and of nations. I am of opinion it ought to be construed according to the law of nations; Virginia, at the time, being to all intents and to every purpose a sovereign and independent nation ; and the States for whose benefit said cession was made being alike sovereign and independent. It is true that they were friendly States; but that can make no difference in the construction of a contract between them. 2 Rntherforth’s Inst. p. 460. It is a general principle of the iawr of nations, that a grant from a Sovereign must be strictly construed, both by the law of nature and of nations; and that it must be so construed even between Sovereign and citizen where the public domain is ceded away. 1 RutherfortKs Inst. p. 200; Martin v. Waddell, 16 Peters’ R. 367 ; Arnold v. Mundy, 1 Halsted’s R. 1; 3 Kent’s Comm. 348. That is, *681 that the deed is not to be construed most strongly against the grantor, but that the actual intention of the grantor must be gathered from the whole deed; and a grant made by a Sovereign will extend to the edge of the water, or to high or to low water mark, according to such intention. Hatch v. Dwight, 17 Mass. Rep. 289.
What did Virginia intend in relation to the Ohio river ? Is it not clear that she intended to reserve to herself the entire river, and not a part of it ? And were there not at that time many reasons that she should have so retained it, both for the purposes of war and peace ? It is a fact well known to history, that the confederation was considered nothing but a rope of sand, and was believed by none to possess power to hold the States in union; and Virginia must have seen at the time of making the deed of cession a probability of a disunion. But if she only reserved her right over it for the purposes of navigation, it is certain she intended to make those who navigated the river amenable to her laws, and to throw the shield of her protection around her own citizens who might navigate it in any stage of its waters. But if her grant is to commence at low water on the northwestern side, the object of her reservation is altogether defeated. Can it be believed that Virginia only reserved her jurisdiction over the river when it was of no use for navigation or any thing else, and that the moment it becomes navigable it may be navigated, and the persons so navigating, by attaching themselves to the opposite shore, or running on the northwestern side between high and low water mark, would be entirely out of her jurisdiction, while yet they would be on and navigating the Ohio river, which Virginia reserved to herself?
Some light may be thrown upon the construction of the deed of cession by an examination of the definition of a river given by writers on national law.
*682 The most approved of those writers define a river to consist of the water, the bed, and the banks. It is a compound idea: it cannot exist in the absence of auy °f its constituent parts. Deprive it of a bank, and it loses its character of a river. Take from it its bed, and the same consequences ensue. It cannot be confined to the simple term water,, because that is only an ingredient of the compound. Then you must necessarily associate the bed, the banks and the water, to constitute any idea of the term river. Thus Rutherforth, in his 1st Inst. p. 90, 91, in giving his reason why the ocean does not admit of property, says, it “ is not contained within banks or shores ; for it rather encompasses the land, the continent as well as the islands, than is encompassed by it. The natural uncertainty, therefore, of the thing, both as to the whole of it and as to its principal parts, renders it incapable of being appropriated by occupancy. But the case of rivers, bays, straits, pools or lakes is different from that of the ocean. For though, as fluid bodies, they are not set out into certain and determinate parcels by any marks or limits upon their surface, yet as they are contained within banks or shores, which are near to one another, they are by this means made certain and determinate enough to admit of property by occupancy.”
Now, if this be the true definition, then the Ohio river is all that space contained between its banks; and the territory ceded must necessarily commence at high water mark while the water is contained within its banks. But if the banks are not to be taken into consideration, the bed does certainly form a portion of the river; and the water receding for an hour, a day or a month, or even three months, and again returning and occupying the said space for at least nine months in the year, would not destroy its character of bed of the river.
That such was the construction put upon the deed of cession by Virginia, seems to follow from her compact *683 with Kentucky. In the said compact she secured to all the citizens of the United States the free navigation of the Ohio river, and to the States possessing the opposite shores concurrent jurisdiction with herself and Kentucky on the river; and as this jurisdiction was given for the purposes of navigation, it must be so construed as to make the grant effectual for that purpose ; and must of necessity have extended to all the river within the territory of Virginia, at every stage of its waters. Can any person read this compact with Kentucky, and doubt that Virginia believed she possessed exclusive jurisdiction of the entire river ? In her grant, she does not ask of the States bordering on the northwestern side of the river any other or further jurisdiction for herself on said river, nor did she make the grant to the other States depend upon their conferring any jurisdiction upon her; for the plain reason, that she did not think they possessed any thing to grant.
It is contended by some, that the other States having accepted and exercised the concurrent jurisdiction given them by Virginia, has thereby conferred concurrent jurisdiction upon her between high and low water mark on the Ohio side. I shall not here undertake to decide whether this be so or not. But I am inclined to think that that grant gave Virginia no jurisdiction beyond that which she had reserved by the deed of cession. But if she has so obtained jurisdiction, it is because the act or thing, over which jurisdiction is given, was committed upon the Ohio river: and it seems that the same reasoning, seeing that Virginia had retained the Ohio river to herself, would carry the territorial to the same extent with her concurrent jurisdiction. That Virginia intended to retain jurisdiction over the whole river, is manifest from the fact that she conferred concurrent jurisdiction upon no other State until after the adoption of the Constitution of the United States, when all fears of a dissolution of the Union were dispelled.
*684 There would be no difficulty in giving the deed of cession the construction here contended for, were it not for the opinion of the Supreme Court of the United States, in the case of Handley's lessee v. Anthony & al., 5 Wheat. R. 374. I propose, in a concise manner, to examine that opinion. The first thing to be observed is, that it was not necessary for the Court, in order to decide that case, to ascertain the boundary between Indiana and Kentucky; it being clear that the land in controversy belonged to the main land of Indiana, and that it was partially separated from the other main land at high water by a bayou making out of the Ohio river and running into other watercourses and again emptying itself into the river. As well might it be contended that the making a canal through in the same direction would have deprived Indiana of her jurisdiction. It also appeared that the government of the United States ever after the cession, and Indiana after she had been formed into a State, had extended their laws and exercised jurisdiction over the laud in controversy; and Kentucky had never extended her laws over it or claimed any jurisdiction over persons or property residing on it. In order to shew that it was necessary, for the purpose of deciding the case, to ascertain the boundaries of Indiana and Kentucky, the opinion of the Judge below is relied upon. But this surely cannot mend the matter ; because, if it were not necessary for the Court below to decide that question, its having done so could not create a necessity for the Supreme Court to decide it. But what is decided by that case ? Nothing except the rights of the parties to the land in controversy. It does not establish the boundary line between Kentucky and Indiana. Neither Kentucky, Virginia, Indiana nor Ohio is bound by it. By the opinion of the Supreme Court it is conceded that Virginia intended to reserve to herself the river Ohio; but in ascertaining what the river is, it did not follow the definition given *685 by the writers on international law, nor any other definition that I have been enabled to discover, but seemed arbitrarily to confine it to the lowest stage of the water, and by so doing, one third if not one half of the entire bed of the river, which is covered with water ten months in the year, is decided to be no part or portion of the river. The Chief Justice says, “in pursuing this inquiry, we must recollect it is not the bank of the river, but the river itself, at which the cession of Virginia commencesmeaning, as I suppose, the water of the river at its lowest stage. Whether this be correct or not, will depend on the question whether the word river is a compound idea, consisting of banks, bed and water. If this idea of a river* be correct, then, if this reasoning be correct, commencing at the banks would be commencing at the river. But even suppose it should commence at the water; is it not proper that it should be placed at that point where the water usually stands for nine months in the year? The Chief Justice quotes the following passage from Vattel: “ If a country which borders on a river has no other limits than the river itself, it is in the number of territories that have natural or indeterminate limits, and it enjoys the right of alluvion.” And he then proceeds to say, “Any gradual accretion of land, then, on the Indiana side of the Ohio would belong to Indiana; and it is not very easy to distinguish between land thus formed and land formed by the receding of the water.” This quotation *686 and argument is used to establish the low water mark as the boundary. Let us examine this doctrine of alluvion somewhat in detail, and see what consequences will re-suit from it.
In VatteVs Law of Nations, ch. 22, p. 181, the proposition is distinctly asserted that alluvion can in no manner affect the right of property in the river; for, says the writer: “As soon as it is established that a river separates two territories, whether it remains common to the inhabitants on each of its banks, or whether each shares half of it, or whether, in short, it belongs entirely to one of them, their rights with respect to the river are no ways changed by the alluvion.” Thus the doctrine of alluvion can have no possible bearing upon a question of boundary; for it depends upon the priority of claim or right, whether the line shall be the middle of a river, or to the opposite shore from the State or Kingdom that is asserting its jurisdiction.
It is true that if by a slow and gradual process land was formed on the Ohio side, and in fifty years the river should be thrown a mile or more upon the Virginia territory ; or if the river should gradually and imperceptibly recede, so as to leave its original bed, and thus form a new bed upon the territory of Virginia, still the river would be the line, and the land thus deserted by the river would be the property of Ohio. But if at the end of fifty years the river commenced gradually to return, and in the course of time did return to its ancient bed, the line between the States would still follow the river, and the land formed or deserted would belong to Virginia. Now, apply this principle to the gradual recession of the Ohio river during the summer months, as it was applied by the Supreme Court to shew that the low water mark was the true boundary, and a very different result follows to that arrived at by the Court; for if the line follows the water as it recedes to its lowest point, it would return with it when the water covered its bed and *687 filled its channel. Bat in truth the doctrine of alluvion . and recession cannot be applied to the rise and fall of rivers. The accession of the water to any mark cannot prejudice the boundary line, or the possession and appropriation of the river; for, says Vatlel: (Law of Nations, ch. 22, p. 180:) “If a river leaves its bed, whether it be dried up, or whether it takes its course elsewhere, the bed belongs to the master of the river; for the bed made part of the river, and he who had appropriated to himself the whole, had necessarily appropriated to himself the parts.” Again, in speaking of the river, he says: “ But if, instead of its being gradually and progressively displaced, the river, by an accident merely natural, turns entirely out of its course, and runs into one of the two neighbouring States, the bed it abandons must serve for the boundary ; and it belongs to the master of the river.” Therefore, no matter how low the water is or ever recedes, it does not affect the boundary, and consequently cannot defeat the power claiming jurisdiction to the opposite bank. In Marten's Law of Nations, ch. 4, sec. 3, p. 159, the doctrine is emphatically settled, that “a nation may bo understood as lawfully occupying the river on its frontiers, even to the opposite banks. But if these banks are occupied by another nation, and if it be impossible to determine which of the two has had the prior possession, it ought to be presumed that both took possession at the same moment, and consequently met in the middle.” Thus Virginia having established her title by priority of possession, and not having ceded the same, she must of necessity have retained her jurisdiction, in accordance with the law of nature and of nations, to the opposite side of the Ohio river, at a point not less than high water mark within its banks. And the only exception to this rule is the event of two States settling on the river at the same time, or having had possession so lopg that it is impossible to determine which settled first upon its shores. On all other occasions the rule is inflexible.
*688 In construing the deed of cession, the Supreme Court seems not to have adopted the rules of construction of the national, natural, or common law, but to have fixed a rule of convenience, not to Virginia, but to the new States to be formed out of the territory ceded. After speaking of the cession, it says : “ And this territory, according to express stipulation, is to be laid off into independent States. These States, then, are to have the river itself, wherever that may be, for their boundary. This is a natural boundary ; and in establishing it, Virginia must have had in view the convenience of the future population of the countiy.”
It cannot be doubted that Virginia, to some extent, had the convenience of the future population of the new States in view. But that convenience was subordinate to the interest and protection of her citizens. One thing is certain, that she intended to extend her own municipal regulations over every person who navigated the Ohio river. It is said, that it is expressly stipulated that new States should be formed out of the territory ceded. It is equally true that Virginia knew that in a short time those States might be hostile. She certainly knew they would be States in which slavery would not be tolerated. Is it not probable that she retained her dominion over the whole river to protect her slave property ? She must have known that a slave entering a country in which slavery was not established by law, and in which the common law prevailed, with or without the consent of the master, would be free. But the States having engaged in the Constitution to deliver up slaves who had escaped from their owners, Virginia no doubt believed that no danger would result to that property by giving other States concurrent jurisdiction over the river. But if Virginia did not intend to reserve the whole river to herself, but fixed the boundary to the low water mark on the northwestern side, then she has failed to afford protection to her citizens navigating the river. *689 If the jurisdiction of Ohio commences at low water mark, it is an exclusive jurisdiction to all the territory northwest of it, which jurisdiction cannot be affected by high or low water; and therefore a citizen of Virginia navigating the river in his own boat, with his own slaves, and intentionally passing between high and low water mark on the Ohio side, the slaves would become instantly free ; or if he had a ferry established from Virginia to the Ohio shore, and should send his slave with it across the river, the moment the boat crossed the low water mark or struck the Ohio shore, his property in the slave would cease. But it is contended this would not be so. Let us examine it. No one can doubt, were it not for the provision of the Constitution before alluded to, that if a slave escaped from his master into any of the free States, he would become instantly free. But the right of the master to the slave is only protected when he escapes from possession and enters a free State without his consent. The instant the master consents to his entering the free State, the Constitution no longer protects his property in the slave, but the law of the State which he enters operates and sets him free. In order to avoid this conclusion, it is contended that the concurrent jurisdiction of Virginia extends to high water mark, notwithstanding her territorial jurisdiction extends only to low water mark. It seems to me, such a position cannot be sustained; because, if Virginia granted from low water mark, she has conferred exclusive jurisdiction upon the United States, (which has been transferred to the State of Ohio,) over the whole territory from the place of its commencement. And neither the United States nor Ohio have conferred any jurisdiction upon Virginia over the territory ceded, nor has Virginia asked that such jurisdiction should be conferred upon her. She has not made it the condition of any right granted to Ohio. It therefore cannot result from implication. Therefore, if the line is fixed at low wa *690 ter mark, and a citizen of Virginia voluntarily passes within, that line, he is as much under the jurisdiction and amenable to the laws of Ohio as if he were at her seat government. But it is said that having the right to navigate the river protects the property of the master in the slaves engaged with him in such navigation. This cannot be so, because the right to navigate confers no jurisdiction. Where one State or Nation confers upon the citizens of another the right to navigate its rivers, the citizens so navigating by such permission are under the jurisdiction and amenable to the laws of the Sovereign whose rivers they are so navigating. The citizens of Virginia have a right to navigate all the rivers within the boundaries of Ohio, yet it would hardly be supposed they would have a right to employ their slaves in such navigation and retain their property in them as slaves, against the provision of the laws of Ohio. Every citizen of the United States has the right to navigate the James river, and no one will contend that so navigating it they are not subject to the laws of Virginia.
As to the argument of inconvenience to Ohio, it is not necessary to say any thing further than to observe that most of the inconveniences complained of would happen whether the line was fixed at high or low water mark. Neither will it be necessary to ascertain what her rights to the river would be as the owner of one of its borders; because every right that she could ask is conferred upon her by giving her concurrent jurisdiction.
The inconvenience supposed to arise from the power of individuals to locate the land between high and low water mark on the Ohio side, cannot exist, because, if the space between the banks be decided to be the bed of the river, it would not be subject to location.
It seems to have had great influence with the Supreme Court in establishing the low water mark, that it was the most convenient and easily ascertained boundary. *691 It seems to me that no boundary could have been fixed that could be more uncertain, or that could not be more easily ascertained. Does it mean the lowest point to which the river ever recedes ? By some it is said not, but ordinary low water. Now what is ordinary low water ? Does it mean the lowest point to which the river ever has fallen during seasons not remarkable for drought or for the quantity of rain that may have fallen in any given year ? If so, there are no two years in which the line could have been the same. But the reasoning used to fix it at the low water mark will carry it down to the very lowest point to which the water ever receded. The argument by which the line is carried to ordinary low water mark is, that the river recedes from a part of its bed for three months, from another part one month, and from another a week in the year, leaving the sand and gravel uncovered by water: it thereby loses its character of being the bed, and consequently a part of the river, and acquires the character of land freed from the river. It would seem, therefore, to follow, that after the river had fallen to its ordinary point of low water, and still continued to fall for a month, leaving a considerable portion of its bed bare between the ordinary low water mark and the edge of the water, by the same reasoning it would properly be denominated main land, and form a part of the territory of Ohio. It is a fact well known that at low water there are many narrow bars commencing at the Ohio shores and running more than half way across the entire river. In accordance with the opinion of the Supreme Court, these would be a part of the territory of Ohio and under her exclusive jurisdiction, and their afterwards being covered by water would or could not change that jurisdiction. Can it be possible that Virginia, for a single moment, intended to establish any such line ? In practice it would be impossible to ascertain the low water line, because on this trial no man could tell where the low water mark *692 was at the place where the crime was committed, yet almost all could tell the high water line. I therefore conclude that the high water mark, while the river is contained within its ordinary hanks, is much the most convenient and easily ascertained boundary.
Upon the whole, I am of opinion that the Circuit Superior Court of Law and Chancery for Wood county had jurisdiction to try the offence set out in the indictment.
Robebtson, J.
The various questions adjourned by the Circuit Superior Court of Wood county, for our opinions, may be resolved into one : Is the place in which the criminal offence charged in the indictment is found to have been committed, within the jurisdiction of Virginia ?
It is a question purely legal. Regarding it in that aspect, I shall pass without comment all arguments of a political complexion, and especially those upon the exciting topics of slavery and abolition.
I shall also decline all examination of the original title of Virginia to the territory northwest of the river Ohio. The occupation of that territory by this State, and legislation over it, prior to its cession to the United States, and indeed the terms of the cession itself, would seem sufficient evidence of such title in the present case, and perhaps in any case between Virginia and Ohio; the latter having no claim except under that cession. But independently of these considerations, the question is concluded by the solemn declaration of this State in its sovereign capacity, contained in the Constitution of 1776. To that instrument all the departments of our State government owe their existence and acknowledge implicit obedience. The judiciary at least have no power to change the limits of the Commonwealth proclaimed in her organic law. The result of a decision in conformity with the pretensions of the defendants, if *693 such a decision were in a legal sense possible, would be not merely to dismember the State, but to annul the commission of every Judge of this Court residing in the ... | , , ..... , transalleghany country, the title to whien, it is argued, stands upon the same footing with that to the northwestern territory ; and thus, in the same breath in which we announce our judgment, to proclaim its invalidity.
One further preliminary remark :
We sit here as a State Court, in the exercise of our ordinary municipal jurisdiction over individuals charged with a criminal offence. Our decision cannot settle definitively the question of boundary; certainly not as against Ohio, and by consequence, it would seem, not as against Virginia. Still, in the particular case, and as a precedent or rule in others of a similar nature, be that decision what it may, it must determine the rights and vitally affect the interests of citizens claiming under these States respectively. And thus viewing it, I feel it due to myself to assign the reasons which have led my mind to its conclusions.
The propositions contended for on the part of the defendants are, that the Stales of Ohio and Yirginia are bounded by the middle of the channel of the Ohio river, or at the least by the low water mark on the northwestern side. For the Commonwealth, it is urged that the banks of the river, or high water mark, constitute the true boundary; or if not, the edge or margin of the water for the lime being, wherever that may be.
The first proposition of the defendants, that insisting on the middle of the channel, is based upon the supposition that Virginia had no original title to the Ohio river, or territory beyond it. The cession is treated as a mere compromise, whereby Virginia yielded that to which she had no superior right. This supposed defect of title has been urged upon the one side and denied upon the other, in arguments of great labour and ability; but for reasons already stated, I deem it unnecessary and *694 improper to investigate that question j and upon this point I believe no difference of opinion exists among the Judges.
Rejecting this proposition, then, as wholly without foundation, and assuming, as we are bound to do, that the northwestern territory and the river Ohio itself were in the limits of Virginia at the time of her cession to the United States, the next enquiry is, Does the boundary of the State of Ohio extend to low water mark on the northwestern side of the river, and to that limit exclude the jurisdiction of Virginia ?
The Supreme Court of the United States, it is said, have so decided in effect, if not expressly, in the case of Handley’s lessee v. Anthony; and upon the authority or strength of that case, mainly if not exclusively, depends the great question involved in this. The decision is not pressed upon the Court as one conclusively controlling our judgment. Were such its effect, it would have been useless indeed to adjourn to us the questions under consideration, and a waste of time to discuss or consider them. Those questions have been propounded for our opinions, and we must decide them, directed by the light, imperfect as it may be, of our own understandings, and undazzled by the lustre of great names. The judgment of the Supreme Court undoubtedly is entitled to the utmost deference: but conceded as it is, not to be of binding authority in the present case, and controverted as it has been by counsel on both sides, we cannot, if we would, decline the duty of examining with freedom as well as candour the reasons upon which it is founded. Such an examination seems demanded at our hands, not merely because of the important interests involved, but because the propositions asserted are exceedingly questionable, if indeed they are not a plain innovation upon the established doctrines of the law.
The matter in controversy was the right to a tract of land claimed by the opposing parties respectively under *695 conflicting grants of Kentucky and Indiana. This brought up necessarily the question of boundary between those States, which in principle I concede is the same with that between Virginia and Ohio. The Court in which the trial was had instructed the jury, that admitting that the boundary of Kentucky included all the islands of the Ohio river and extended to the northwestern bank of the river, yet no land could be called an island of that river unless it toas surrounded by the water of the Ohio at low water mark; and that to low water mark only on the western or northwestern side of the Ohio did the boundaries of the State of Kentucky extend.
The Supreme Court sustained the instructions. The Chief Justice delivered the opinion. He remarked that the question depended chiefly upon the land law of Virginia and her deed of cession. The only reference, however, he gives to the land law, is to the clause prohibiting locations upon the northwestern side of the river Ohio, contained in the act of 1779, establishing the land office. 10 Hen. Stat. p. 50. This prohibition he thinks was made with a view to the questions then agitated relative to the unsettled territories within the charters of particular States, which resulted in cessions by them to the United States, and among others, in that by Virginia. It was intended, he says, by Virginia when she made this cession, and most probably when she opened her land office, that the great river Ohio should constitute a boundary between the States which might be formed on its opposite banks; and “ this intention,” he adds, “ ought never to be disregarded in construing this cession.”
The motives and intentions of Virginia may have been such as are inferred : their bearing upon the particular question, however, seems very remote. None doubt that by the cession itself the river is constituted a boundary. But the question remains, does that of ne *696 cessity or by a sound construction make low water mark the line of separation? Surely the prohibition of all entries on the northwest side of the Ohio river justifies no s110*1 conclusion. Nor is it warranted, I think, by any other provision of our land law, existing at the time of the cession.
The well known rule of the common law, which was and is now the law of Virginia, except so far as altered by statute or inapplicable to the country, is, that lands bounded by the sea, or on navigable rivers where the tide ebbs and flows, extend to high water mark only ; but bounded on rivers or upon the margin, or along the same, above tidewater, go to the centre of the stream.
So far as regards rivers and creeks not navigable, the rule last mentioned has always been considered and still is the law of Virginia. Home v. Richards, 4 Call 441; Hayes’ ex'or v. Bowman, 1 Rand. 417; Mead v. Haynes, 3 Rand. 33; Crenshaw v. Slate River Co. 6 Rand. 245.
But the beds of all navigable streams were considered as the' property of the Commonwealth, for the public benefit; and in the case of Home v. Richards, 4 Call R. 441, (as Judge Green remarks, 3 Rand. 36,) the Court determined they were not grantable even before the revised act of December 1792, ch. 24. The 6th section of that act incorporated the act of May 1780, ch. 2, “ to secure to the public certain lands heretofore held as common,” which prohibited locations of lands ungranted by the former government on the seashore, or on the shores of any river or creek in the eastern parts of the Commonwealth, either under surveys previously made or to be made in future. The revised act of 1792 included also the beds of such rivers and creeks in the same prohibition. In 1802 the prohibition was extended to the western waters; Sess. Acts 1801-2, ch. 8. After reciting in the preamble that it had been represented to the General Assembly that many persons had located, and laid claim in consequence of such location, *697 to the banks, shores and beds of rivers and creeks in the western parts of the Commonwealth, which were intended and ought to remain as a common to all the good people thereof, the act declares “ that no grant issued for the same, either in consequence of any survey already made or which may hereafter be made, shall be valid or effectual in law to pass any estate or interest therein.”
I have found no legislation directly recognizing low water mark, except a resolution of the Grand Assembly in 1679, and the comparatively late act of February 1819. The resolution was inserted in Hening’s general collection, taken from a manuscript copy of the laws. 2 Hen. Stat. 4.56 and note. It seems rather a judgment than a law, pronounced on a petition of an individual; though it is called a declaratory order, and in general terms declares that “every man’s right in vertue of his patient extends into the rivers or creeks soe farre as low water marke,” &c. Neither the resolution itself, nor the principle it asserts, is to be found in any of the numerous editions or revisáis of our laws. If it was ever law, I regard it as long obsolete, or as repealed by the act of 1780.
The other act, that of February 1819, (Acts of 1819, eh. 28,) reciting that doubts exist how far the rights of owners of shores, on the Atlantic ocean, the Chesapeake bay, and the rivers and creeks thereof, extend, declares that “hereafter the limits or bounds, &c. shall extend to ordinary low water mark,” <fcc. with this proviso, among others, that nothing in the act shall be construed to repeal the 6th section of the act concerning the land office ; meaning the act of 1792.
It is needless at present to enquire into the reasons, (though perhaps satisfactory ones might readily be suggested,) why the Legislature confined the prohibition in the act of 1780, or the privileges of the act of February 1819, to owners of lands on the eastern waters; or *698 to attempt to reconcile the apparent conflict between the act of February 1819, and that of December 1792, which last is declared not to be repealed, and which was incorporated in the revised bill of March 1819, together with the prohibition relating to the western waters, contained in the act of 1802. It is enough to say, that as the land law of the State was understood and expounded at the date of the cession, no grant of land on the waters of the State, eastern or western, navigable or unnavigable, carried the right of the owners to low water mark.
Had the Supreme Court, then, taken as their guide the land law of Virginia, embracing the common law of England as it was originally, or as modified, they must have adopted either high water mark, or the centre of the stream, as the proper line of demarcation : unless the cession contained some express exception, or clear and unequivocal declaration to the contrary. So is the doctrine as laid down by Chancellor Kent, 3 Kent’s Comm. 428. But the cession, and the cotemporaneous construction put upon it, repel all pretension on the part of Ohio to go to the eentre of the stream. This manifestly must have been the opinion of the Court: and there being no express designation of any other line, the legal inference—that which alone is consistent with the law referred to and with the deed—is, that the northwestern bank of the river, in other words high water mark, was the true boundary.
But the Supreme Court, it may be said, must have considered that the question being one relative to the boundaries of independent States, should be governed by the law of nations. That, too, I think, is the opinion of this Court; and I entirely concur in it.
• Pursuing the enquiry, doubtless in this view, the Chief Justice reminds us emphatically that it is not the bank of the river, but the river itself\ at which the cession of Virginia commences. After quoting the words *699 of the grant describing the territory, and stating its object to be to create independent States, he repeats that these States were to have the river itself, wherever that may be, for their boundary. This, he says, is a natural boundary, and Virginia, in establishing it, must have had in view the convenience of the future population of the country. He then adverts to the doctrine of the writers on national law. “ When a great river,” he says, “is the boundary between States, if the original property be in neither, and there be no convention respecting it, each holds to the middle of the stream: but when, as in this case, one State is the original proprietor, and grants the territory on one side only, it retains the river within its own domain, and the newly created State extends to the river only.” He then remarks, “the river, however, is its boundary:” and Vattel, (Book 1, ch. 22, <§> 268,) is quoted to shew that “in case of doubt, every country lying upon a river is presumed to have no other limits but the river itself: because nothing is more natural than to take a river for a boundary, when a State is established on its borders; and whenever there is a doubt, that is always to be presumed which is most natural and probable.”
No comment is made on the passage from Vattel. But I cannot forbear remarking that Vattel, in speaking of a case of doubt, must have had reference to cases where the question was whether the limits of the country extended to the river, and not whether they extended to any designated part or line. For he is treating of the doctrine of alluvion, and proceeds immediately to observe, (■§> 269,) that as soon as it is established that a river separates two territories, whether it remains common to each, or whether each shares half, or ichether it belongs entirely to one, their rights with respect to the river are no ways changed by the alluvion. He was not considering the question whether high or low water, or the middle of the stream, was in doubtful cases the *700 true boundary; he had already said, (§266,) that in such .... , . , cases the limit was the centre of the stream. JNor was the case before the Supreme Court one of doubt as regards the original title to the river. They recognized that title as in Virginia. The purpose of the quotation could not have been to represent Vattel as authority for the doctrine held by the Court in establishing low water mark: it was, probably, to shew that Vattel spoke, as the Chief Justice had repeatedly done, of the river itself as a boundary, and to infer from that expression, or from the doctrine of alluvion, an argument in favour of low water mark. But the frequent repetition of the phrase in question affords no solution of the difficulty. What is the extent of this boundary, the river itself is still the question: and to that the Chief Justice recurs in a subsequent part of his opinion.
To the passage just cited is added the following, from a preceding paragraph of the same author on the subject of alluvion: “ If the country which borders on a river has no other limits than the river itself, it is in the number of territories that have natural or indeterminate limits, and enjoys the right of alluvion.” (§ 268.)
Following.up this idea, the Chief Justice says : “ Any gradual accretion of land, then, on the Indiana side of the Ohio would belong to Indiana; and it is not very easy to distinguish between land thus formed and land formed by the receding of the water. If, instead of an annual and somewhat irregular rising and falling of the river, it was a daily and almost regular ebbing and flowing of the tide, it would not be doubted that a country bounded by the river would extend to low water mark. This rule has been established by the common consent of mankind. It is founded on common convenience.”
Certainly, if the proposition be correct that a country bounded by a tidewater stream would without doubt extend to low water mark, there would be a strong argument from analogy, to maintain the claim to low water *701 mark on a navigable stream above the tide. But I have been unable to find the rule said to be so universal, maintained by any Court, or writer of authority, prior to the case of Handley’s lessee v. Anthony. If there be any such, it seems also to have escaped the vigilance of counsel. But were the rule as stated, on tidewaters, the argument would rest solely upon the reasonableness of applying the same rule to navigable waters above tide, and not upon any analogy with the doctrine of alluvion. I am at a loss to understand the application of that doctrine to the proposition maintained by the Supreme Court. If the reason why Indiana should have the land between high and low water marks be the same which governs the right to alluvion, then it would seem to follow that as land formed by gradual accretions would be lost by gradual encroachments, so land gained by the annual receding of the waters between high and low water marks would be lost by their alternate annual encroachments. But there is a plain reason for the doctrine of alluvion, wholly unconnected with the question whether high or low water mark, or the channel, be the proper boundary, and which forbids its application to the diurnal or annual rising or falling of all waters. The river may have one master, the land beside it another. If the land be augmented, the increase should belong to the land owner, as an incident to the thing of which it becomes a part. If the water encroach, it should belong to the owner of the river in its augmented condition, for the same reason. But the doctrine of alluvion, though applicable to gradual accretions, is not applicable to the land on tidewater, over which the tide ebbs and flows; and cannot therefore, by analogy, be applied to that on other streams, between the lines of their annual swell or depression. The right, if it exist, must rest upon some other foundation : and accordingly the Chief Justice, in this part of his opinion, after dwelling on the inconvenience of any other rule, goes on to *702 say—“ Wherever the river is a boundary between States, A 1S the main, the permanent river, which constitutes that boundary; and the mind will find itself embarrassed with insurmountable difficulties in attempting to draw any other line than the low water mark.”
Here we find the end and aim of the expression, so frequently repeated, that the river itself is the boundary. The idea attached by the Chief Justice to the term river is, that it is the stream only as it exists when at low water, which constitutes what he terms the main or permanent river.
I shall not stop to comment on the singularity of the idea, that the river, when it is reduced to its smallest dimensions—a condition in which it remains for a transient period—should be considered as the main or permanent river. The idea does not, I think, enter into the mind of any one thinking or speaking of a river or the main river, to conceive it as the stream only contained between its lines of greatest depression; or in other words, as the stream at low water only. Can any thing be meant by the terms, main or permanent river, more than the term river itself imports? If so, the term as usually defined or understood, certainly conveys no such idea. A river is defined to be a stream of no precise dimensions, but larger than a brook: and it is that stream in all its conditions and stages; equally the river when reduced even far below ordinary low water, or when full to the top of its banks, or even when swelled by freshes beyond them. Nor does this notion of a river, on which the argument has been in part built up, that it is the stream within the low water marks, find any colour from the writers on national law. They tell us, a river is not to be considered as so much water merely, but as water flowing in a particular channel and enclosed in certain banks. Grotius De Jure Belli ac Pads, book 2, ch. 3, § xvii. 1. The water, the bed and the banks all enter into the idea of a river. The water *703 alone is not the river: we speak of the water of the river—the bed of the river, &c. And the banks, it may be material to remark, according to the same author, (Ibid, book 2, ch. 8, $ ix. 1,) are the outer part of the bed, that is to say, of the space in which the river has its course naturally.
Had the river, then, eo nomine, been made the boundary, with words or intention sufficiently explicit to exclude the State of Ohio from going to the middle of the stream, it would have been the river, not according to this contracted notion, but in its entire state; the river between its natural banks; in other words, to high water mark.
This is so upon the reason of the thing, I think, as well as upon authority. 17 Mass. Rep. 289. For the bed of the stream and its banks, (I speak now more particularly of streams above tidewater,) though not identical, are, as appears from Grotius, coterminous: and the boundary of a tract of land, if this be so, would be the same, supposing it not to extend to the channel, nor to be expressly limited by low water mark, whether the boundary were declared to be the river itself, or the river margin, or the bank, which is its margin.
It is true that the cession does not declare in so many words the northwestern bank to be the boundary. Neither does it use the phrase so repeatedly used in the opinion under consideration, “ bounded by the river itself.” It grants the tract or territory lying “ to the northwest of the river.” It is safer always, in construing a deed, to keep to its terms than to resolve them into others. Now these terms, as already said, neither in conformity with the law of Virginia, the common law of England, nor the law of nations, nor according to their ordinary signification or import, are synonymous with the words “ beyond low water mark on the northwestern side of the river.” And 1 humbly conceive, in this instance the acute and powerful mind of the Chief Justice, in *704 the pursuit of a favourite idea, has been led to a conclusion not only unsupported by preceding authority, but seemingly directly at variance with it. Looking to the particular phraseology, and regarding the bed as part of the river up to its banks, it would seem a strained construction to say that land to the northwest of low water mark is land lying to the northwest of the river. It is difficult to understand how any part of the river can be said to be to the northwest of the river. We may say, Wood county is in the northwestern part of Virginia, but we cannot say it is to the northwest of (or from) Virginia.
If a river leaves its bed, Vattel (Law of Nations, B. 1, ch. 22, §5,) says the bed belongs to the master of the river. For the bed makes a part of the river, and he who had appropriated the whole had necessarily appropriated the parts. If, then, the Ohio were a small stream, and should dry up, or should change its channel, the whole bed, to the banks, would revert to Virginia, if the fact, as conceded by the Chief Justice, be admitted, that Virginia retained the river, and the law be as Vat-tel has stated it. If, on the other hand, the law be as decided by the Supreme Court, the grant of the land on the northwestern side extended to low water mark notwithstanding the river was retained by Virginia; and in case the channel should be deserted, Ohio would still hold to low water mark. Now the principle, I apprehend, does not vary with the size of the stream; and if not, it is difficult to reconcile the doctrine of the Supreme Court with that of Vattel and Grotius.
Let us pass to the argument founded on inconvenience.
This argument is rarely resorted to, and never properly, except in cases of great doubt, or where the inconvenience is so extreme as to raise a presumption that it was not contemplated or intended by the parties. In the latter case the rule, founded in reason, obtains not *705 only in the municipal codes probably of all civilized States, but in the law of nations, that the grant of a thing implies the grant of all that is essential to its enjoyment; or, as it is expressed by a modern writer on international law, (Wheaton, Elements of International Law, part 2, ch. 4, <§> 13,) the principal right draws after it the incidental right of using all the means necessary to secure the enjoyment of the principal right itself. It is necessary therefore to enquire whether the inconveniences suggested or supposed in this case are embraced by the rule, and if so, whether they justify or require the remedy applied by the Supreme Court.
The object of the cession being to create independent States, the Chief Justice suggests that Virginia, in establishing the river as a boundary, must have had in view the convenience of the future population ; and afterwards observes: “ Even when a State retains its dominion over a river which constitutes the boundary between itself and another State, it would be extremely inconvenient to extend its dominion over the land on the other side which was left bare by the receding of the water.” This may be true. But the question here is, not whether such dominion, retained by Virginia, would be convenient or inconvenient to the States on the opposite side of the river, but whether she had the right to retain it, and if so, whether that be the true construction of her grant ? Or, more definitely, are the inconveniences such as to warrant the presumption that Virginia, in granting the territory “ to the northwest of the river,” meant that it should extend info fhe river to low water mark ?
What inconveniences were in the view of the Court, we are not told. In the argument of the present case, the counsel for the defendants presented them in detail, and made them the subject of an earnest appeal. These alleged inconveniences are substantially as follows :
*706 That all contracts entered into, all matters, indeed, civil or criminal, occurring on the Ohio side, between high and low water mark, (if high water mark be established as the boundary,) will be beyond the cognizance of the Courts of Ohio, and within the jurisdiction of Virginia.
That the possession of the soil between high and low water is essential to Ohio, not only for purposes of police, but to enable her citizens to have free access to the river, to erect wharves, steam mills, &c.
And that if the soil between those lines be in Virginia, land warrants, under her authority, may be laid upon the river shore on the whole line of the State of Ohio.
Were all these inconveniences as real as I apprehend they are for the most part imaginary, would it follow that 'Virginia might not have imposed them as the condition of her grant ? If they exist, they result from the fact that Virginia"retained, as the Supreme Court admits, the river to herself; and so far at least as they are not incompatible with the enjoyment of the thing granted, the land to the northwest of the river, no Court has power to apply a remedy, and, with a view to convenience merely, enlarge the boundary of the one State or contract that of the other.
Even if the case were one of greater doubt; if the terms of the cession, expounded according to their legal or natural import, did not confine the grant to the northwestern margin or bank of the river, there would be a strong presumption against its extension to low water: ánd that presumption would be irresistible, if such extension be attended with inconvenience to Virginia, and be not indispensable to the full enjoyment of the principal rights granted to Ohio. Vattel says that “a river is rff such great use, that when a nation takes possession of á country terminated by a river, it is to be presumed to have intended to reserve the river to itself. This presumption is indisputable when it relates to a *707 river extremely large, and the strength of the presumption increases if the river be confined; and is still greater if the nation has used the river for navigation or fishing.” Now, would not the reasons for presuming a reservation originally, in derogation of the claims of those whp might thereafter settle on the opposite side, forbid a presumption in a doubtful case that the original owner intended to surrender any part of the river? Such certainly would be the presumption in the case of a grant to individuals of lands upon the sea-shore : (see 3 Kent’s Comm. 432, citing the authority of Sir William Scott:) and the reason of the presumption equally, 1 think, if not more strongly, applies to grants upon all navigable streams to other States. The reservation of the river is pro bono publico. So strong is the inference against a grant of its bed or shores, that it has been doubted whether the Legislature or the State could grant them away. Home v. Richards, 4 Call’s II. 441. Such grants, (as already mentioned,) have been, before the cession, if not from a very early period, prohibited by statute in Virginia. I will add, that almost from the first settlement of the State, laws were passed, in substance repeatedly reenacted, and continued in force down to the present day, prohibiting all obstructions in the navigable waters of the Commonwealth. Act of 1680, 2 Hen. Stat. 484 ; Act of 1705, 3 Id. 395; Act of 1722, 4 Id. 111; 2 R. C. of 1819, ch. 235, § 17-1.8. Is it not reasonable to infer that for the same reason, the prevention of all impediments to navigation, a State in possession of a large navigable stream might desire to retain it to itself, and with it the lawfid right to remove such impediments ?
But here we are not left to conjecture. It was an admitted fact in the case before the Supreme Court, that Virginia had retained the river: and the Court, by construction, held that to mean the river, not in its entire state from bank to bank, but from low water mark on one side to the same line on the other.
*708 But have not the inconveniences to Ohio been greatly overrated ?
As riparian owner, bounded by the high water mark, I apprehend she is clearly entitled under the cession to claim for her citizens free access at all times to the river, the right to erect wharves, and in general to the innocent use of the water; by which I understand is meant every use not inconsistent with the safety and convenience of the State owning the river opposite to her territory, and of other States entitled to its free navigation. Grotius, B. 2, ch. 2, § 12-14; and ch. 3, & 7-12; Vattel, B. 2, ch. 9, § 126-130; and ch. 10, § 132-134; 3 Kent’s Comm. 427; Wheaton’s Elements, part 2, ch. 4, § 12. Steam mills or other engines, 1 suppose, would fall under the same rule. But if the effect of placing these between high and low water mark, would be to obstruct the free navigation when the river should be full, I presume Ohio would have no right to erect them, and the Supreme Court could not extend her right to low water mark for a purpose so injurious to the original owner of the river, and so incompatible with the intention of the grant. So far it seems, for any lawful purpose, the ownership of the soil is not essential to Ohio. To ask it for any other, would be an unanswerable argument against it.
Does she require it, then, for purposes of police ; for the cognizance of crimes or contracts properly or of right subject to her laws ?
Looking to the objects of the cession, the grant of an extensive territory to be formed into States, it must be readily admitted that all means essential to the existence of the States and the maintenance of their laws within their territorial limits, pass with the grant. But we cannot extend the inference beyond the necessity. We cannot infer jurisdiction beyond the territorial limits : still less can we extend the territory beyond its prescribed limits, in order to bring the jurisdiction within them. *709 Supposing jurisdiction over the space between high and low water essential to the full enjoyment of the principal rights granted, still we have no right to presume an intention to grant the soil, unless the soil be indispensable to the exercise of jurisdiction. It may be convenient to Ohio to possess the soil to low water mark, or to the middle of the channel, with half the bed and islands of the river, (which indeed the counsel for the defendants appear to regard as rightfully hers): but as a convenience merely, we have no right to presume it. Courts must expound contracts, but may not alter them. And on the ground of necessity, the presumption, I think, cannot be authorized; because the requisite jurisdiction may be exercised without the possession of the soil. That the soil or domain may be in one State, and jurisdiction, concurrent or exclusive, in another, can admit of no doubt. Vattel, B. 1, ch. 18, § 105; ch. 23, § 295; ch. 24, § 244. Within certain limits, the United States possess jurisdiction over all the States: yet the States possess the soil or domain. The most then that could be justly presumed in conformity with the principle that gives as incidental to a grant all that is necessary to its enjoyment, would be jurisdiction over the space in question, and not the soil itself.
Independently of the legal presumption under the principle just adverted to, the attention of the Court has been called to a clause in the act of Virginia creating the State of Kentucky; which declares that the respective jurisdictions of Virginia and Kentucky shall be concurrent only with the States that may possess the opposite shores. On this clause two questions have arisen: First, What is meant by the phrase “concurrent jurisdiction?” Secondly, In what sense did that act speak of the new States as possessing the shores opposite to Virginia ?
It is not necessary, perhaps, and therefore would not be proper, to express any decided opinion in the present *710 case touching the construction of the act referred to. If the terms “concurrent jurisdiction” import, as some suppose, and as would seem to be their natural signiiication, coextensive or equal jurisdiction, then it entirely obviates the objection we have been considering ; since, upon that supposition, Ohio possesses by express grant plenary jurisdiction, not over the space in question merely, but over the whole river for all purpose^ for which she could reasonably or lawfully desire it. If this construction be correct, the consequence, that it may authorize Ohio to exercise jurisdiction to the high water mark on the Virginia side, may be a matter of serious consideration with Virginia, but can afford no foundation for a claim on the part of Ohio to any portion of the bed of the stream. Nor does the danger of conflict in the exercise of this concurrent jurisdiction disprove its existence. Should such conflict arise, the difficulty can only be adjusted by the laws which govern cases of conflicting jurisdiction between sovereign States, or by amicable conventions. I cannot concur in the idea, however, that the right of free navigation secured to all the citizens of the United States gives to the other States of the Union jurisdiction over the river. If such were the effect, it would have been very useless to give or retain concurrent jurisdiction to the border States in the act creating the Stafe of Kentucky. Virginia must have thought, that owning the river, she had a right to grant or restrict jurisdiction over it as she might think proper. Free navigation over a river belonging to one State implies no right of jurisdiction in any other. Whatever may be the extent of the jurisdiction supposed to be conferred on or retained by the border States, it is confined exclusively to them: and the grant, upon the supposition that the above is a correct interpretation, was obviously regarded by Virginia as limiting or dividing her otherwise absolute and unbounded empire over the river within the limits of her territorjr.
*711 If any claim, then, be set up for Ohio, under this part • • of the act creating Kentucky, it must be one for jurisdiction, concurrent jurisdiction only, and not soil. Nor does the latter part of the same clause, (which speaks of the jurisdiction of Virginia and Kentucky as concurrent with the States that may possess the opposite shores,) justify, in my opinion, the use or the interpretation made of it. The term shores, it is said, is the ground between ordinary high and low water mark. In speaking of the northwestern States, then, as owners of the shores, Virginia is supposed to have used the term in this sense, and thereby admitted the soil to be in those States. It does not seem regular or proper to lay hold of the expressions of an instrument between other parties to explain the deed of cession, to which it makes no reference. Technically the term shores is applicable only to the sea or tidewater. But, most obviously, it was used here in its more extended sense, as synonymous with the term more appropriate to rivers, namely, banks. And so regarded, as it must be, the phrase means nothing more than to describe or refer to the States in question as possessors of the opposite banks, or rather of the territory lying on or bounded by them. In this sense the Chief Justice himself, who refers to the expression, but without putting this technical construction upon it, most probably understood it. He lays some stress upon the term shores; but all he says is, “ This term seems to be a repetition of the idea under which the cession was made. The shores of a river border on the water’s edge.” This is certainly true, and corresponds with definitions before quoted from Qrotius— “ The river is the stream between certain banks;” and “ The banks are the outer part of the bed, that is, the space in which the river has its course naturally.” And the bed is that space at all times, whether actually covered with water or not.
*712 But if the term is to be expounded in its technical sense when applied to streams of a different description, still it cannot be interpreted to enlarge the grant specially made by the act. That grant is specially one of jurisdiction only. And even if it could be strained into a concession of soil, yet Virginia retained to herself and Kentucky concurrent jurisdiction over the river, the entire river, in all its stages.
Neither, then, under that act, nor under the cession, can any surrender of the soil be presumed. Where incidental rights are to be inferred in a doubtful case, all the rights of the original possessor should be left unimpaired, not essential to the enjoyment of the rights granted. The justice of this principle will not be denied. Jurisdiction being all that was required, jurisdiction only should be presumed. Nor does there seem to be a reason or principle justifying an extension of the right over the soil to low water mark on the northwestern side, for the sake of jurisdiction, which would not carry it to the same line on the southeast, or at least ad medium filum aquae.
But has any serious ground of complaint on this subject of jurisdiction been shewn to the Court ? Has not . Ohio, at all times prior to the case of Handley's lessee v. Anthony, and since, exercised all the jurisdiction she desired over the river, and especially over the space between high and low water ? On the other hand, has Virginia, at any time previous to the case now before us, exerted her jurisdiction in a way to induce any complaint? Is there any real danger that she will ever .covet a jurisdiction so inconvenient and vexatious ; or that individuals having access to the Courts of Ohio, will go across the river to Virginia, to obtain process which the party complained of may instantly and forever elude or defy ?
Nor does there seem to be much reason to apprehend danger from grants by Virginia of the space between *713 low water and the banks of the river. In sixty years no such grant has been made. All such grants on all the western waters, are expressly prohibited by her statute law ; and if not, would be contrary to her own interest, as well as a flagrant violation of her compacts, securing the free navigation of the river to all the citizens of the Union.
This argument, from abuse moreover, if it were sound, surely would apply with equal force to the one State as to the other. If the domain when retained by Virginia, may lead to such consequences, may they not ensue from vesting it in Ohio ? Are we to infer abuse of power over the soil by one State, its ancient possessor, and for that reason transfer the same power to another ?
Virginia and all the States have at least the right of use and navigation. With these rights, whatever may be the doctrine of the common law, (which is not obligatory upon States,) that of the law of nations, I apprehend, gives the incidental right of using the banks, for mooring vessels, lading and unlading cargoes, &c. Wheaton's Elements of International Law, part 2, ch. 4, § 13, citing Grotius, Vattel and Puffendorjf. If Virginia may lawfully exclude Ohio from access to and just use of the river, as seems to be thought, by holding the soil between high and low water, may not Ohio, if she be its owner, as lawfully exclude Virginia from the use of the banks ? And is it not as necessary that the one should have the lawful power to prevent such abuses or injuries as the other?
If it were legally possible that Virginia could grant the soil in question to individuals, still she could grant it only in subservience to the just rights of Ohio; free access, and uninterrupted use and navigation.
In sustaining the instruction of the Court below, that low water mark was the line of demarcation, the Chief Justice, recurring to the fixed impression upon his mind *714 that a boundary by the river was something wholly different from one by its banks, proceeds to say: “If it be true that the river Ohio, not its ordinary bank, is the boundary of Indiana, the limits of that State can be determined only by the river itself.” But the idea that a boundary by the river excludes a boundary by the bank, so far from being sanctioned, is at variance with all authority: and the repetition of the phrase only brings us back to the brink of the difficulty. “ The same tract of land,” he adds, “ cannot be sometimes in Kentucky and sometimes in Indiana. It must be always in the one State or the other.” I will not stop to enquire whether, in a legal sense, it is impossible that the same land should be sometimes in one State and sometimes in another. There is such a thing, it is said upon very high authority, as a moveable freehold, and an example is given of a possession alternis vicibus. Co. Litt. 48 b. cited in 3 Kent’s Comm. 431; Scratton v. Brown, 4 Barn. & Cress. 485. Supposing ordinary low water adopted as the boundary, the land between .that and extraordinary low water must be sometimes in .the one State and sometimes in the other, held by them ■ alternis vicibus. or it must belong to Ohio upon every reason which sustains her right to ordinary low water. For if given to Virginia, it leaves Ohio, for the time being, liable to all the inconveniences supposed to arise from vesting in the former the space between ordinary low water and the bank; though certainly for a shorter time, and to a less extent. But supposing the 1 and cannot sometimes belong to one and sometimes to another, by no means proves it must of necessity belong to Ohio. Access, the innocent use and free navigation of the river and jurisdiction, are all that Ohio can want or have under the cession. Let it be inferred, if concurrent jurisdiction be not enough, that her jurisdiction is exclusive over the space in question when left bare, and concurrent with that of Virginia, when covered by the *715 water, and there is no need to strain the construction so as to give her the right of soil. If the objection be sound that the soil cannot belong alternately to each, yet surely the jurisdiction may. The Courts of Common Law and Admiralty exercise alternate jurisdiction under similar circumstances over the space upon which the tide ebbs and flows: and I discern no reason why this divisum impar him may not be exercised also by independent States.
“ There would be little difficulty,” the Chief Justice proceeds, “ in deciding that in any case other than land which was sometimes an island, the State of Indiana would extend to low water mark. Is there any safe or secure principle on which we can apply a different rule to land which is sometimes, though not always, surrounded by water ?” Certainly not. The conclusion would be undeniable were the premises correct. But they are a plain assumption of the very question in issue. Assuming that low water was the boundary all along the main land, terminated the case. Could that have been shewn upon authority, the arguments from analogy, inconvenience, or possible abuse, might all have been well spared.
After shewing that the cases of an island and of the main land were within the same reason, and pointing out the inconvenience of regarding the people inhabiting a neck of land separated from Indiana by a bayou or ravine, but from Kentucky by the river Ohio, as a part of the last mentioned State, and likening it to the case of the inhabitants of a strip of land along the whole extent of the Ohio, considered as part of the State on the opposite shore, the Chief Justice adds, “Neither the one nor the other can be considered as intended by the deed of cession.”
I will not suppose that this remark was meant by anticipation to settle the question of boundary between Ohio and Virginia. In speaking of a slip of land con *716 taining inhabitants, the Chief Justice could not well have meant the slip between low and high water. I presume it was meant as an illustration only, to shew that the same inconvenience would result to the inhabitants of an island, such as that before the Court, as to those of the main land. He then expresses the opinion that “ if a river, subject to tides, constituted the boundary of a State, and at flood the water flowed through a narrow channel, round an extensive body of land, but receded from that channel at ebb, so as to leave that land connected with the main body of the country, this portion would scarcely be considered as belonging to the State on the opposite shore, although that State should have the property of the river.” It is always difficult to pronounce what would be the law of a supposed case ; and never safe to do so without a precise enumeration of all the facts necessary to a correct judgment. But when in the next breath the Chief Justice speaks of the principle that a country bounded by a river extends to low water mark, as one so natural and of such obvious convenience as to have been generally adopted, I must, with the most unfeigned respect, acknowledge my surprise ; unless his allusion be to conventional arrangements. What these may have been, I have not deemed it necessary to examine. They can have no influence on the question before us. Where compacts exist, they of course define the rights of the parties. Modus et conventio vincunt legem. But if the remark be intended to represent the low water mark as the boundary established by law, where there is no treaty or compact, or where the terms of the compact are doubtful, and one of the States was the original possessor of the whole river, all I can say is, that I have not been fortunate enough to find the case or the author that maintains it.
11 The case,” he tells us immediately after, “ is not without its difficulties: but in great questions which concern the boundaries of States, where great natural *717 boundaries are established in general terms, with a view to public convenience and the avoidance of controversy, we think the great object, where it can be distinctly perceived, ought not to be defeated by those technical perplexities which sometimes influence the contracts between individuals.” Surely if the principle generally adopted, as the Chief Justice supposes, recognizes low water mark as the boundary of countries bounded by a river, there was no difficulty in deciding that the case before the Court came within it. I concur entirely in the justice of the remark that not in great cases only, but in all cases, ought the real object of the parties to be protected against technical exceptions. But neither ought new or arbitrary rules to be laid down because of the magnitude of the case. Were that allowable, the judgments of Courts, like the waters of the great stream which have been so much the subject of discussion, would indeed often transcend their proper limits, and become as uncertain as the evanescent, vacillating, unmarked and unknown line which contains its waters at the period of its utmost or ordinary depression.
I have gone through with the examination of the case of Handley’s lessee v. Anthony. I am aware it must seem unnecessarily prolix. But I prefer to encounter that censure, rather than be supposed to have passed without the maturest consideration any one of the views, however minute, which led the profound and acute minds of the Chief Justice and his associates to the conclusions they adopted. It was due to myself to explain the grounds upon which I have ventured to differ with those learned and eminent Judges: and I cannot but hope they are such as, if not sufficient to satisfy the minds of others, will at least afford some reasonable foundation for my own deep and sincere conviction that the judgment in question is unsustained by principle or authority. Not only so, it has already perhaps led to most anomalous results. The law of boundary, the *718 rights of riparian owners, are one thing on the southeastern side of the Ohio river, and another on the northwestern : stranger yet, in the same State, the State of Ohio, the law of the great river which borders her territory is not, if I correctly understand the decisions of her Courts, the law of rivers in the interior of the State. Gavit v. Chambers, 3 Ohio R. 495. The law of the Ohio is not the law of the Sandusky or the Scioto.
It must be admitted that the question is not without its difficulties: and it may be thought any other boundary would be as open to objection as that by the low water mark. I think not. Were all others in every other respect equally objectionable, there is one objection to low water mark to which the others contended for are not liable; namely, that no principle of law as adjudged or settled upon authority, before the case of Handley’s lessee v. Anthony, has been adduced or is known to have recognized it. But high water mark, besides the weight of authority in its favour, is less exceptionable on the ground of uncertainty; and the actual edge of the water at all times not only less uncertain, but one, in my view, of entire certainty. Neither the lowest point of depression, nor ordinary low water, which always occur in the summer or fall, can ever be known till those seasons have passed. Suppose these lines once ascertained, they may undergo annual and daily changes, and may and must be speedily, perhaps the next day or hour, concealed if not obliterated for the residue of the year. Not so with the high water mark. That, once ascertained, may be more readily verified ; the receding waters leaving it accessible until in their annual return they shall again attain it. But the actual edge of the water requires no witness. It testifies for itself: and whether a given transaction occurred within or beyond it, all must know who were witnesses to the occurrence itself.
*719 With a very strong impression upon my mind that this last would be the more convenient boundary, but that high water mark is most in accordance with the law, I forbear to give any decided opinion between them; because, in my view, it is not necessary in answer to the questions adjourned. If the latter be the true boundary, then the place in which the offences are found to have been committed was within the jurisdiction of Virginia, clearly: and so I think it is if the edge of the river, wherever it may be, give the rule; making a case of divisum imperium, or giving to Ohio alternate and even exclusive jurisdiction when the water recedes. I cannot concur in the opinion of some of my brethren, that the circumstance that the bow of the canoe, in which the slaves were, was at the time on the beach at the water-edge, or that the defendants, who went down to assist them, were standing in the water at the bow, and consequently on the ground beneath, are sufficient, if the jurisdiction of Virginia extended at all times to the water-edge, to oust her of that jurisdiction. The idea seems founded upon Constable's Case, or other authority to the effect that all things attached to shores, up to which the Admiralty Courts have jurisdiction, are regarded, for the reason that they are so attached, as within the jurisdiction of the Courts of Common Law. 5 Co. Rep. 106. Even this authority does not go to the extent that articles lodged elsewhere, on a rock, or on the soil of this contested ground between high and low water, would not be within the admiralty jurisdiction. But the authority referred to relates to a question of controverted jurisdiction between the English Courts of Common Law and Admiralty. It is the opinion of Common Law Judges, of Coke especially, whose authority in such cases has been seriously doubted on account of his known hostility to the Admiralty Courts. It can afford no rule for settling a question of contested jurisdiction between sovereign States. The rule between *720 equals admits of no preference on the ground of superi°r pretension, in cases of equal right or divided empire. The principle so often adverted to, that the incident would go with the principal right, would give the rule. Each party would have jurisdiction to his limit; he could have no power to step beyond it. If an article of property belonging to the owner of the soil should fall partly in the water, it would belong to its original owner: at most, the owner of the water could not claim beyond his line. So if a boat belonging to the latter touch or moor against the bank, the same rule would apply: it would still be the property of its owner, the master of the river. Or, supposing each to have in this case equal and concurrent jurisdiction, that first exercised would have the preference. The distinction, to say the least, is one extremely subtle; too much so, perhaps, to be made the subject of grave discussion. Certainly, but for the high respect I entertain for those of my brethren who seem to favour it, and the belief that it has had great influence in producing the present judgment, I should have passed it without a comment. We cannot easily reconcile with reason or convenience the notion that an offender who commits a murder in a boat between high and low water would be within the jurisdiction of Virginia, but exempt from that jurisdiction if, at the same spot, he was not on the surface of the water but standing on the ground beneath it. This would indeed be to defeat a great object by a technical subtlety, which, if recognized by the common law, is certain]}1-, I apprehend, unknown to the law of nations.
My opinion is, and I think the General Court should so certify to the Circuit Court, that the place in which the offences charged in the indictment are found to have been committed, is within the jurisdiction of Virginia, and consequently within thé jurisdiction of the Circuit Court of Wood county.
*721 Johnston, J.
The most important question arising in this cause, is that respecting the boundary line between the States of Virginia and Ohio. Having once settled this point, and ascertained the true line where the territory of the one State begins and that of the other ends, it will be easy to determine whether the offence with which the defendants in the indictment are charged was committed within the jurisdiction of Virginia or of Ohio. I shall therefore proceed to consider, in the first place, what is the true boundary between these two States; and, in doing so, I shall assume that the title of Virginia to the northwestern territory was a valid and subsisting one at the time she ceded it to the United States, notwithstanding the very learned argument submitted by the counsel for the State of Ohio to prove the reverse. It does not become a Virginia Court, it seems to me, to argue such a question. It is not open for our consideration. It has been closed by the original Constitution itself, by which our government was established in 1776. By that solemn instrument (after ceding and confirming to Maryland, Pennsylvania, North and South Carolina, the territories contained within their respective charters,) it is declared that “ the western and northern extent of Virginia shall, in all other respects, stand as fixed by the charter of King James the first, in the year one thousand six hundred and nine, and by the public treaty of peace between the Courts of Great Britain and France in the year 1763,” &c. That this charter of King James, which granted to the Virginia company the territory extending from Point Comfort 200 miles to the south and 200 miles to the north along the Atlantic coast, and thence a breadth of 400 miles to the west and northwest quite through the continent to the coast of the Pacific, embraced the territory northwest of the river Ohio, and that the title of Virginia thereto was valid notwithstanding the suppression of the said company by the royal proclamation in 1624-, Virgi *722 nia has repeatedly declared by acts of her Legislature and by her final cession of it in 1783 to the United States. Whatever weight these solemn acts of Virginia, claiming the territory in question, may be entitled to in the estimation of others, it seems to me they are conclusive upon this Court; and therefore, that we are bound to regard the title of Virginia as valid at the time she ceded the same to the United States.
Virginia, then, being the proprietor of the territory on both sides of the river Ohio, by her deed in 1783 conveyed all her “ right, title and claim as well of soil as jurisdiction” to that part of it “situate, lying and being to the northwest of the river Ohio” to the United States.
By the very terms of this grant, the river itself did not pass. The conveyance was of the territory lying and being to the northwest of the river; and these terms exclude the idea that Virginia intended to part with the river itself; but on the contrary clearly manifest her intention to retain it in her own territory.
But if this were doubtful from the conveyance itself, the river would still belong to Virginia by the law of nations. According to that law, when a great river is the boundary between two States, if the original property is in neither, and there be no convention respecting it, each holds to the middle of the stream. But when, as in this case, one State is the original proprietor and grants the territory on one side only, it retains the river within its own domain and the newly created State extends to the river only. Thus, by the law of nations, as well as by the very terms of the cession, Virginia did not part with her property in the river.
But it is equally clear, it seems to me, that she did part with her property in every foot of territory beyond the river; and that she intended to confer upon the United States the whole northwestern territory, commencing at, or resting upon the Ohio river. Now these *723 two intents of Virginia, apparent, it seems to me, on the whole territory on the opposite side of the river, and the intent to confer it upon the United States up to the river, can only be effected by adopting the low water mark on the Ohio as the dividing line between them. If any other be established; for instance, if the bank of the river, or high water mark, or the mark when the river is at its ordinary height be fixed as the boundary line, then, during those portions of the year when the river is at low water, there will be a strip of land along the whole course of the river, between low water mark and the boundary line, belonging to Virginia, and that too lying to the northwest of the river Ohio and separated by that river from the rest of her territory: And, moreover, this same strip of land, during the same periods of the year when the river should recede to low water mark, would be an intervening space between the territory ceded away by Virginia and the river itself. In other words, the citizens of the State of Ohio, which was formed out of a portion of this territory, would have to pass over a part of the territory of Virginia in order to reach the river, which by the obvious intent of the grant was intended to be the boundary between the two States. The very statement of the proposition, it seems to me, is its own refutation. Who ever dreamed that Virginia owned any territory beyond the river Ohio since her deed of cession ? Or who ever supposed that a citizen of Ohio had to pass over Virginia soil and thus subject himself to a foreign jurisdiction before he reached that noble river from which his State derived its name ? face of her deed, to wit: the intent to part with the
Nor does the assumption of some, that the Ohio river comprises not only the water in the bed of the stream but the bed itself, whether covered with water or liable only to be covered, and that the strip of land left bare by the receding of the water would, belong to Virginia in right of her original sovereignty over the river, which *724 she never parted with, remove the difficulty. By whatever right or title Virginia held it, it would still present an intervening space of ground between the State of Ohio and the Ohio river at low water; and every individual who reached the river from the State of Ohio, would do so by the courtesy of Virginia, in permitting him to pass over her territory.
Neither is the difficulty removed by saying, that under the compact between Virginia and Kentucky, (which I shall have occasion to notice more particularly hereafter,) it was provided that the respective jurisdictions of those two States on the river, should be concurrent only Avith the States which might possess the opposite shores. Still, the original sovereignty of Virginia over the river remained the same. She chose to divide her jurisdiction over it with Ohio, but she did not divide her dominion over the soil. That remained absolute and exclusive. And so, in any point of view, if the low Avater mark is not the true boundary line, the space of ground left bare by the receding of the water between that mark and the real boundary, Avherever it may be, Avhether the bank of the river or high water mark, will be the absolute property of Virginia, forming a part of its territory and separating the territory of Ohio from the Ohio river at low water.
What if Ohio does possess concurrent jurisdiction over this strip of land Avith Virginia. By Avhose laws shall it be governed? Which State has a right to enact latvs for the government of this territory of Virginia ? Has Virginia alone that right, or does she share it in common with Ohio ? If Virginia alone, then all the offences committed, all the contracts entered into and all the property upon this disputed territory are subject to the laws of Virginia. But if each State possesses this right, then in case of a conflict of laAvs, Avhich is to prevail? Are the citizens, of Ohio, engaged in their daily business upon the shores of this busy river, load *725 iug and unloading boats, building wharves, erecting ma- . • chinery, buying and selling produce, to be subjected while thus employed to the laws of another State of ■ • -, , , , , which they are ignorant i or are they to be regulated and governed by two distinct codes differing, it may be, essentially from each other ?
These are but a few of the many difficulties and inconveniences that would inevitably flow from considering Virginia the absolute proprietor of the land between low and high water mark, whether she exercised exclusive jurisdiction over it or concurrent only with Ohio. In either event it would be her soil; for, not being included in her deed of cession, her original sovereignty over it would remain unimpaired. And then what would prevent her from saying to Ohio and her citizens, you shall not violate my territory by passing over it to the river ? True, the Ohio river itself, being a navigable stream, is, according to the law of nature and nations, a common highway, and you have a right, notwithstanding my dominion over it, to the free use of it for the purposes of navigation ; but then, you have no right to pass over my soil without my consent, to get to it. It would be no answer to such an objection for Ohio to say, true, you are the owner of the land you speak of, but then it is a part of the shores of the river, and the right to the free use of the river includes a right to the use of the shores. This would have been a good answer under the civil law, which, going beyond the common law, declared that all rivers, where the flow of water was perennial belonged wholly to the public, and carried with it the right of fishing as well as the public use of the banks. Inst. 2, 1, 2. And in the 3d volume of Kents Commentaries, p. 332, the learned author says that Bracton, adopting the doctrine of the civil law, held that the right of fishing in rivers and the use of the banks was common jure gentium. But, adds the Chancellor, “ it is every where agreed, that this common *726 right is liable to be modified and controverted by the municipal law of the land, and no person has a right to pass over the lands of others in order to get to the water.” And accordingly, in Blundel v. Catterall, 5 Barn. & Ald. 268, “ the doctrine of the civil law as stated by Bracton was disclaimed, and it was held, that the public had no common law right of passing the beach, or seashore, for the purpose of bathing in the sea, as against the lord of a manor, who was owner of the soil of the shore, and had the exclusive right of fishing therein.” Now, at common law, the shores of the sea as well as the shores of navigable or tidewaters, belonged to the Crown, and were common to every person till granted; but when granted away by the Crown, as in the case just referred to, no person could pass over them in order to get to the sea. Suppose Virginia then should grant away the shores of the Ohio, which are nothing more than the space of ground between low and high water mark, as will presently be shewn, how would Ohio reach the river when the water was down to low water mark ? See Hale, De Jure Maris, where it is laid down that the shore of the sea of common right belongs to the King, but may be vested in a subject by prescription or grant; as, if the King grants a manor cum littore maris eidem adyacente, the shore itself will pass.
Surely a doctrine involving the inconveniences and consequences to which I have but alluded, cannot be correct; and if there were no other reasons, these of themselves would be sufficient to lead us to adopt the low water mark as the boundary line between the two States.
But, fortunately, we are not without authority upon this most interesting and important question ; authority, too, of the highest character and entitled to the gravest consideration and utmost deference of this Court. I mean, of course, the authority of Chief Justice Marshall, in the case of Handley's lessee v. Anthony, 5 *727 Wheat. R. 374, cited at the bar. This was an ejectrnent brought in the Circuit Court of the United States for the District of Kentucky, to recover land claimed by the plaintiff under a grant from Kentucky, and held by the defendant as a part of Indiana under a grant from the United States ; and the title depended upon the naked question whether the land in controversy was located in the State of Kentucky or the State of Indiana. In order to determine this, it became necessary to ascertain the true boundary line between these two States, and in doing so, the Court below held that the State of Kentucky extended only to low water mark on the western or northwestern side of the river Ohio, and did not include a peninsula or island (which included the land in controversy) on the western or northwestern bank, separated from the main land by a channel or bayou, which was filled with water only when the river rose 10 feet above low water mark, and at other times was dry. And this decision was unanimously affirmed by the Supreme Court of the United. States, the highest legal tribunal in our land, over which presided the greatest judicial character of the age in which he lived. Now, if the low water mark separates Kentucky from Indiana, the same line separates Virginia from Ohio; for both Indiana and Ohio were portions of the northwestern territory ceded to the United States by Virginia, and the true boundary of each therefore depends upon the proper construction of the same deed of cession. The case of Handley's lessee v. Anthony, is an express authority, then, upon the identical question before this Court, and is entitled, it seems to me, to the most profound respect. It is not surprising that its force, therefore, should have been attempted to be broken, in argument, by contending that although the question of boundary was decided, yet it did not properly arise in the case, and that the real question was, whether the land claimed by the plaintiff was an island or *728 not.' But this attempt, it seems to me, entirely failed. There were two exceptions to the opinion of the Court below, and the Chief Justice, in delivering the opinion °f the Court above, says : “ The two exceptions present substantially the same questions to the Court, and may therefore be considered together. They are, whether land is properly denominated an island of the Ohio, unless it be surrounded with the water of the river when low ? and whether Kentucky was bounded on the west and northwest by the low water mark of the river, or at its middle state ? or, in other words, whether the State of Indiana extends to low water mark, or stops at the line reached by the river when at its medium height ?”
And in another part of his opinion he says: “The opinions given by the Court must be considered in reference to the case in which they were given. The sole question in the cause respected the boundary of Kentucky and Indiana, and the title depended entirely upon that question. The definition of an island, which the Court was requested to give, was either an abstract proposition, which it was unnecessary to answer, or one which was to be answered according to its bearing on the facts in the cause. The definition of an island was only material so far as that definition might aid in fixing the boundary of Kentucky.” So far then from the question whether the land was an island or not, being the main one in the cause, it was, in the opinion of the Supreme Court, only material so far as it might aid in fixing the boundary of Kentucky and Indiana, which in fact, in the language of Judge Marshall, was the sole question involved, and was directly brought up by the instructions asked for in the Court below both by the plaintiff and defendant. By the 2d instruction, for instance, moved by the defendant, the Court was asked to instruct the jury that the lessor of the plaintiff could not recover, “because the evidence does not shew that the land is within the limits of the State of Kentucky." *729 Did not this present the question, what are the limits of Kentucky ? And how could this be ascertained but by determining what was the true boundary line of that State? If low water mark was that true line, then whether this land, surrounded by a bayou at ordinary water, was technically an island or not, it was not within the limits of Kentucky which reached only to low water.
So in the plaintiff’s instruction the Court was moved to instruct the jury, that if the laud in controversy was surrounded by a regular water channel of the Ohio on the northwest side, and was at the middle and usual state of the water surrounded by the waters of the Ohio, flowing in said channel, then it was an island and Uu>ithin the State of Kentucky.'1'1 Here the Court is asked directly, to affirm that the land was in Kentucky. How could it do this without first ascertaining the boundary line of Kentucky ? The negation of the first part of the proposition, that this land, surrounded by a channel which at times was dry, was an island, did not settle the latter part of the proposition which affirmed that the land was in Kentucky; for this land might not be an island, and yet it might be in the State of Kentucky. For if Kentucky extended to high water mark it did include this land, if the channel or bayou running around it was, as the plaintiff below contended, to be considered a part of the river. Was it not proper then for the Court to decide whether Kentucky extended to high water mark or reached only to low water? It seems to me that it was, and that there is no plausible ground for evading the just weight to which this authority is entitled, by saying that the Supreme Court did not understand the question raised by the record, and that they were mistaken in asserting that the real question was as to the true boundary line between Kentucky and Indiana. The case, therefore, it seems to me, is a full and complete authority upon the very question now before this Court, and we *730 must either follow it or repudiate and overrule it. For mY Partj I am disposed most cheerfully to follow it; not merely on account of the exalted source from which it comes, and the safety of following the light that emanates from the mind of such a man as Judge Marshall, but because my own judgment most fully assents to its correctness.
But there are other grounds for believing that Virginia intended by her deed of cession to make the low water mark the boundary between her own and the northwest territory. We have the acts and declarations of Virginia herself, subsequently made, to prove it. In her compact with Kentucky in 1789, subsequent to her deed of cession, Virginia consents that Kentucky should be erected into an independent State upon certain terms and conditions, the 7th of which contained the following provision : “ The respective jurisdictions of this Commonwealth and of the proposed State, on the river as aforesaid, shall be concurrent only with the States which may possess the opposite shores of the said river.”
Now, the shore of the sea, according to Lord Hale's definition, is the ground between the ordinary high and low water mark, and if the King grants a manor cum littore maris eidem adjacente, the shore itself will pass ] though in such a case Lord Coke expresses the opinion that if a grant was made of the sea shore, the freehold would shift as the sea receded or encroached, and it would take all the soil that should from time to time be within high and low water mark. And this idea of a moveable freehold seems to have been entertained by the Chief Justice in the case of Arnold v. Mundy, 1 Halsted’s Rep. 1. But Judge Kent, in his Commentaries, vol. 3, p. 347, referring to these doctrines, says, that he “apprehended the better opinion to be, that in ordinary grants of land bounded on the sea or a river, the boundary limit must be stable, either at ordinary high or *731 low water mark, and not subject to alternate change with the flux and reflux of the tide.” Then the sea shore, as well as the shores of navigable streams in which the tide ebbs and flows, would seem to be the fixed and permanent space between high and low water, not subject to change with the ebb and flow; and the same rule ought to hold, it seems to me, in the case of great navigable rivers, where the tide does not ebb and flow daily, but where the rise and fall is irregular. It has been so holden in Pennsylvania, where the English doctrine that no rivers are deemed navigable except those where the tide ebbs and flows, has been held not to be applicable to the great rivers in that State, such as the Susquehanna and Delaware. And in Handley's lessee v. Anthony, the Court considered that the same reasons of general convenience which had established the rule, by the general consent of mankind, that a country bounded by a river in which the rise and fall was diurnal extended to low water mark, equally applied to those in which the rise and fall was annual. 5 Wheat. 374. It follows, then, from these authorities, that the shores of the sea and of rivers where the tide ebbs and flows, are the space of ground between high and low water mark, and that they are not subject to fluctuate with the rise and fall of the water, and that the shores of great navigable streams like the Ohio or Delaware, are the same, equally fixed and permanent. Hence Virginia, when she spoke in her compact with Kentucky of the States owning the opposite shores, must be understood to have meant by that language the ground between high and low water mark, and this was tantamount to a declaration, that by her deed of cession she conveyed the territory northwest of the river Ohio, commencing at low water mark ; or, what would amount to the same thing, that by her grant of the territory northwest of the river Ohio, the States formed out of that territory would by the law of nations extend to low *732 water mark. This principle of the lex gentium is laid down by Judge Marshall (in the case already referred to of Handley's lessee v. Anthony, 5 Wheat. 374), as indisputable, and “established by the common consent of mankind,” in the case of a country bounded by a river whose tide ebbs and flows: and the same reason, to wit, the inconvenience that would result from the opposite doctrine, would make this principle apply to a country bounded by a great navigable river like the Ohio. For the same Judge proceeds to say, that “even when a State retains its dominion over a river which constitutes the boundary between itself and another State, it would be extremely inconvenient to extend its dominion over the land on the other side which was left bare by the receding of the water. And this inconvenience is not less where the rising and falling is annual than where it is diurnal.” And then he adds, “ Wherever the river is a boundary between States, it is the main permanent river which constitutes that boundary ; and the mind will find itself embarrassed with insurmountable difficulty in attempting to draw any other line than the low water mark.” This is the doctrine, as expounded by the Supreme Court, in regard to .a country or State bounded by a river, and it is referred to with seeming approbation by Judge Kent, in the 3d volume of his Commentaries, p. 348.
The rule of the common law is different when applied to individuals. In such cases, while the riparian owner under a grant from the Crown has a right to go ad filum medium aquae where bounded by a fresh water river, yet on tidewaters he cannot go beyond ordinary high water mark. Cortelyou v. Van Brundt, 2 John. R. 357 ; 3 Kent 346. In such cases the shores below ordinary high water belong to the public, and in a grant of the adjoining lands the grant would be construed most favourably for the public, which needs the shore for common purposes. But the rule would be inapplicable when *733 the grantee was a State instead of an individual. For the very convenience to the public, which restricts the grant in the case of an individual from passing the shores, would operate as a reason why they should pass in the case of a grant to a State. And this, I apprehend, is the true reason why the rule in the two cases is different, and explains (what at first might appear a contradiction) why it is that a grant from the State to an individual would restrict him to high water mark, without express words authorizing him to go farther, and a similar grant to a State would carry it to low water mark. In the latter case the grant would be construed most favourably for the grantee, as the public convenience requires that a State bounded by a river should reach the low water mark and thus be entitled to the shores.
But the moaning of Virginia in the use of the word shores in her compact with Kentucky, may be farther, and perhaps still more satisfactorily ascertained by the use she makes of that term in her Constitution adopted in 1776. By the 21st article of that instrument, it is provided that £! the territories contained within the charters erecting the Colonies of Maryland, Pennsylvania, North and South Carolina, are hereby ceded, released, and forever confirmed to the people of those Colonies respectively, with all the rights of property, jurisdiction and government, and all other rights whatsoever which might at any time heretofore have been claimed by Virginia, except the free navigation and use of the Potomac and Pohomoke, with the property of the Virginia shores or strands bordering on either of the said rivers, and all improvements which have been or shall be made thereon.” And in her subsequent act of 1786, confirming the compact made between certain commissioners of Virginia and Maryland, she uses still more explicit language, in the 7th article of said compact, which provides that ££ the citizens of each State respectively shall have full property in the shores of Potomac river ad *734 joining their lands, with all emoluments and advantages thereunto belonging, and the privilege of making and carrying out wharves and other improvements so as not t0 obstruct or injure the navigation of the river.” Can any one doubt that the shores mentioned in this article extended to low water mark, reserved as they were for the purpose of carrying out wharves and other improvements? And if so, may we not reasonably conclude that the same thing was meant when, in her compact with Kentucky, Virginia spoke of the States owning the opposite shores of the Ohio ? What could be more natural ? For it must be remembered that when she ceded away the northwestern territory, Virginia did so upon the condition that separate and independent States should thereafter be formed out of it, which would in time enter into the Union. And she intended that these States thus to be formed should be bounded by the Ohio river, over which she consented they might exercise concurrent jurisdiction with herself. But this object would be defeated by adopting now the high water mark ; for then, during a part of the year, those States would not be bounded by the river, but would be cut off from the same by the strip of land before mentioned lying between high and low water mark.
It seems to me, therefore, that in whatever light the question is viewed, whether in regard to the inconveniences that would result.from the opposite doctrine, or to authority, or to the laws of nations, or to the evident intention of Virginia as manifested by cotemporaneous acts and declarations, we are led irresistibly to the same conclusion, and that is, that the low water mark on the Ohio river is the true boundary between the territory of Virginia and Ohio, and that consequently, the jurisdiction of Ohio is exclusive to that mark.
I shall now proceed to consider the principal objections, as I understand them, to the views just presented.
*735 And, first, it is said that by her compact with Kentucky, in which it was provided that her jurisdiction and that of Kentucky should be concurrent, on the river only, with the States which might possess the opposite shores, Virginia gave evidence that she considered herself as entitled to the whole river up to high water mark, or, as some contend, even to the top of the bank ; and that consequently she could not have ceded any portion of it away, and that she still retained her original jurisdiction over it.
But I. have already endeavoured to shew that when a river is the boundary between States it is, in the language of Judge Marshall, in Handley's lessee v. Anthony, 5 Wheat. R. 374, the main the permanent river that constitutes that boundary.” If so, Virginia had conveyed away all her “ right, title and claim, as well of soil as jurisdiction,” to the territory northwest of the river Ohio, extending to low water mark, and, consequently, in speaking of concurrent jurisdiction over the river, she must have meant the “ main, the permanent river,” which she had not conveyed away. But even if she did mean more than this in her compact with Kentucky, that could not alter or affect the rights of Ohio ; for she was no party to that compact, and her rights were secured by the deed of cession itself, by which Virginia conveyed to the United, States “ all her right, title and claim, as well of soil as jurisdiction,” to the territory northwest of the Ohio. See her deed of cession or the act authorizing it, in the 1st vol. of the R. Code, p. 40. And this, as we have seen, extended to low water mark. Of course beyond that mark Virginia, at the time of her compact with Kentucky, had no jurisdiction to share with the States on the opposite shores.
I take it, therefore, that the concurrent jurisdiction mentioned in the Kentucky compact over the river, meant the main permanent river, and if so, then Virginia has exclusive jurisdiction to low water mark on *736 the Virginia side. But if Virginia's jurisdiction is concurrent with Ohio to high water mark on the Ohio side, then Ohio's jurisdiction is concurrent with Virginia to high water mark on the Virginia side; and the citizens of Virginia, in that event, are subjected to all the inconveniences that we have spoken of, when treating of the importance of the strip of land between high and low water mark to the citizens of Ohio, for the purposes of trade and the erection of wharves and machinery connected with the use and navigation of the river. Now, I cannot for a moment believe that Virginia intended to give up the exclusive jurisdiction she possessed over the shores on the Virginia side of the river. In her compact with Maryland, 1 vol. R. C. p. 54, it is expressly provided that “ the citizens of each State respectively shall have full property in the shores of the Potowmac river adjoining their lands;” and in the 21st article of our Constitution, already referred to, Virginia gives up to Maryland, Pennsylvania, North and South Carolina the territories contained in their charters, “ except the free use and navigation of the rivers Potowmac and Pohomolce, with the property of the Virginia shores or strands bordering on either of the said rivers, and all improvements which have been or shall be made thereon.” If it was important to us to retain the Virginia shores on the Potowmac, it was equally so in regard to the Virginia shores on the Ohio.
I conclude, therefore, that Virginia has exclusive jurisdiction to low water on this side of the river, and Ohio has exclusive jurisdiction on the other, while over the main permanent river they both possess concurrent jurisdiction ; the ultimate property in the whole river to low water mark on the Ohio side remaining in -Virginia, so that if the river should at any time suddenly change its course, leaving its present bed bare, the land thus deserted would belong to Virginia up to low water mark on the Ohio side.
*737 But it is said that it is important to Virginia to possess concurrent jurisdiction with Ohio to high water, or even farther when the river is high, in order to protect the property of her citizens while passing up and down the river; that if Ohio’s jurisdiction is exclusive to low water mark, then, it is said, a boat passing down the river would, so soon as it passed a line on the surface of the water, corresponding with low water mark, be in the limits of Ohio, and consequently if there should be a Virginian on board with slaves, they, by the laws of Ohio, would be free.
But this, I apprehend, is a mistaken view entirely of the matter. The protection to the property of a citizen of Virginia in such a case would rest upon much higher and safer ground : upon the settled and well ascertained laws of nature and of nations, which declare every navigable river to be a common highway for the purposes of navigation, free to the use and enjoyment of all. And this principle applies not only to rivers forming the boundary between different States, but to those even which lie in the territory of one State exclusively. In such a case the State owning the riyer cannot obstruct it so as to prevent its navigation by others; its right in such a case being only that of a limited property which it cannot exert but by respecting the rights of others. Vattel, B. 1, § 272. And the same author, in B. 2, <§> 124, after saying that the open sea, the use of which is inexhaustible, cannot fall under the domain or property of any one, “ because in that free and independent state in which nature has produced them, they may be equally useful to all men,” adds, “ Even the things which in other respects are subject to domain, if their use is inexhaustible, they remain common with respect to that use. Thus a river may be subject both to domain and empire, but in quality of running water it remains common.”—“Nature, who designs her gifts for the common advantage of men, does not allow of their being kept *738 from their use when they can be furnished with them without any prejudice to the proprietor.” And Sir WilHam Scott, treating of the British title to the four seas. ' w said, that “ in the sea, out of the reach of cannon shot, universal use was presumed in like manner as a common use in rivers flowing through coterminous States was presumed.”
So there is a common use in rivers as well as the sea; and when Virginia, in her compact with Kentucky, stipulated for the free use and navigation of the Ohio river to all the citizens of the United States, she did nothing more than declare the principles of the laws of nature and of nations applicable to that subject.
Who then has jurisdiction over persons and vessels at sea? .In his admirable treatise on the law of nations, contained in the first volume of his Commentaries, p. 26, Judge Kent lays down the doctrine that “no nation has any right of jurisdiction at sea, except it be over the persons of its own subjects and its own vessels; and so far, territorial jurisdiction may be considered as preserved ; for the vessels of a nation are in many respects considered as portions of its territory, and persons on board are protected and governed by the law of the country to which the vessel belongs.” This doctrine is also laid down by Grotius, Rutherforth and Vattel, and is fully recognized in the case of the United States v. Palmer, 3 Wheat. R. 610, in which it was held that our Courts had no jurisdiction to try a citizen of a foreign State for a crime committed in a foreign vessel at sea. The Court say, “ These are offences against the nation ■under whose flag the vessel sails, and within whose particular jurisdiction all on board the vessel are.” And •the same principle was contended for by Judge Marshall in the celebrated argument he delivered before Congress on the resolutions relative to Thomas Nash alias Jonathan Robins. This individual, being a British subject, committed murder at sea on board a British ship, and *739 fled to the United States. His delivery was demanded by the British government, under the treaty between the two governments providing for the surrender of fugitives charged with murder or forgery committed within the jurisdiction of one of the contracting parties, and taking refuge in the country of the other: and the President ordered him to be surrendered. The argument of Mr. Marshall was intended to justify the President, and to prove that although there was a concurrent or common jurisdiction of all nations at sea, in a certain sense, yet “ that the jurisdiction of a nation extends to the whole of its territory, and to its own citizens in every part of the world;” and that consequently our Courts had no jurisdiction to try the individual in this case, he being a citizen of Great Britain, and the murder committed on board a British vessel. It was contended on the other side, by Mr. Gallatin and others, that all nations had a common or concurrent jurisdiction at sea, and therefore each nation bad jurisdiction overall offences committed at sea, and consequently the executive ought not to have surrendered the fugitive, who ought to have been, as they contended, tried in our Courts. But the argument of Mr. Marshall was considered at the time, and ever since, as perfectly unanswerable, and may therefore be with propriety referred to as illustrating the question before this Court.
If this be the correct doctrine in regard to the jurisdiction of nations at sea, the same seems to me to apply to the jurisdiction upon navigable streams; and that consequently a nation or State having a right to the free use and navigation of a river, whether by virtue of the laws of nature or nations, or by treaty with another nation or State, would also have jurisdiction over its citizens and their property while engaged in navigating such river.
This may be illustrated by the present condition of things in the Oregon territory. By treaty, England and *740 the United States have the joint occupation of that territory. Each has a right to the navigation of the Columbia river. Under whose jurisdiction are the citizens of the two countries while thus engaged? Undoubtedly under the jurisdiction of that country to which they belong. Here is the case then of a joint occupation, or concurrent jurisdiction, if you please, and yet the citizens of each State are under the protection of the laws of their own country.
But suppose the joint occupation were to cease, and each country were to have the exclusive possession of its portion of the territory. For instance, suppose England should consent that our territory should extend to the 49th degree of north latitude, provided we gave her the free navigation of the Columbia river, and we were to do so:* under whose jurisdiction would a citizen of Great Britain be while navigating this stream ? Most unquestionably, under that of Great Britain, although the river itself would be the absolute property of the United States.
The same principles, it seems to me, apply to the navigation of the Ohio. Every citizen of the United States has a right to the free use and navigation of that river, and while thus engaged, is under the protection of the laws of the State to which he belongs, just as a citizen of the United States at sea is under the protection of the flag of the United States.
Here then is the security to Virginia citizens with their property. While engaged in the lawful pupose of navigating the Ohio, they are protected by the laws of Virginia, no matter whether they be on the Virginia or Ohio side of low water mark, so they be employed in navigating the river. And this right carries with it the necessary means to its enjoyment: consequently a Virginian would have a right to moor his boat to the *741 shore and take on fuel: for this is necessary to the enjoyment of the navigation of the river. This was insisted on by the United States in 1792, when Spain owned the mouth and both banks of the lower Missis* sippi. It was then contended that we were entitled, by the law of nature and of nations to the navigation of that river to the ocean, subject only to such modifications as Spain might reasonably deem necessary for her safety and fiscal accommodation : and this claim, with the qualifications attached to it, says Judge Kent, “ was well grounded on the principles and authorities of the law of nations.” Kent’s Comm. 1st vol. p, 35. If this was the case in regard to the Mississippi, at a time when it was in the dominions of a foreign nation, how much more in regard to the Ohio, lying within the territory of States that are members of the same federal Union.
Now, it seems to me, that this is placing the rights of Virginia upon much safer ground, in relation to her slave property, than the concurrent jurisdiction claimed for her over the Ohio river at every stage of the water. For this concurrent jurisdiction would extend only as far as the Virginia line dividing her from Kentucky extends. So soon as that line is passed, Kentucky has concurrent jurisdiction with Indiana over the river. What then becomes of the protection to our property, which has passed out of the concurrent jurisdiction of Virginia and Ohio into that of Kentucky and Indiana 1 Are we to look to Kentucky to protect it, because she is a slave State also ? This she might or might not do, as she chose. But suppose Kentucky should follow the counsel of some of her politicians, who are now strongly urging her to abolish slavery, and should become a free State ; where then would be our security ? A Virginia boat, in such a case, having slaves on board, descending the river, would, so soon as it passed the limits of Virginia, find itself in the jurisdiction of two nonslaveholding States ; and then, according to the argument of *742 the counsel for Virginia, the slaves must necessarily be r **
Surely this view of the subject never suggested itself to their minds, or they would have recoiled from placing the security of the property of Virginia citizens upon a ground that might prove so utterly worthless and unavailing. This only serves to shew the importance of deliberation, and the necessity of viewing questions in all their ultimate bearings, (especially those involving great interests, like the present,) before we come to a decision.
Placing the rights of our citizens and their property upon the broad and unquestionable right that every citizen of the United States possesses to the free use and navigation of the Ohio river, they have a security that will be availing under all circumstances and in all time to come.
From all that has been said, the conclusion follows that the accused, being citizens of Ohio, and the offence with which they are charged, having been committed within the territorial limits of Ohio, are not subject to the jurisdiction of the Courts of Virginia, and ought therefore to be discharged.
Clopton and Wilson, J. concurred in the opinion of Johnston, J.
Baker, J.
remarked, that obvious necessity and propriety required that the Court should consider our great western rivers as public navigable watercourses, and treat them according to established legal principles applicable to such highways. It is true the Supreme Court of the United States, in the case of Handley's lessee v. Anthony, 5 Wheat. R. 374, which was a controversy in respect to territory, and which was much relied on by the counsel for the State of Ohio, decided that the low water mark, under the circumstances of *743 that case, was the proper boundary: and although a grant of land to a citizen, bounded upon a fresh water stream or river not navigable, and where the tide neither ebbs nor flows, extends to the channel of such river, (usque ad Jilum aquce,) yet it seems to be established by unquestionable authorities, that a grant of land bounded upon a navigable river, such as the Ohio, may and very often does extend to the edge of the water only, that is to say, to high water mark; and such, I think, is the doctrine properly applicable to the subject under consideration. But be this principle as it may in reference to the circumstances of this case, my opinion is that the difficulties which the Supreme Court, in the case before referred to, seem to think will be produced by establishing any other boundary in respect to territory than the low water mark, do not apply, under the facts of this case, with like force and propriety to the mere question of jurisdiction, and are not, therefore, in this case, of overruling importance. The high water within the banks, or if not, the state of the water in the river at any given time, I apprehend, could be ascertained with more certainty than the low water mark; and the adoption of either the high water mark or the state of the water for the time being, as the preferable memorial of boundary, will leave to each State, as I presume must have been originally intended, the right of jurisdiction over the whole and every part of the river, of which of course neither State could complain. The jurisdiction of both States would in that case be concurrent and coextensive, and Virginia could of course punish any citizen of her own State or of Ohio for any violation of her laws committed on the river, and that too, whether committed on board of her own vessels or otherwise ; and I apprehend that her right to do so could not be ousted or impaired by the consideration that the vessel in which the offence was so committed happened then to be in part resting upon or touching the shore on *744 the Ohio side ; for the right to touch, nay even to make fast to the Ohio shore, arises necessarily from the right to navigate, and without which the privilege of navigation would be greatly impeded. That there are difficulties in this case of no ordinary character, no person, I think, can doubt; and in the very able argument of the counsel for the State of Ohio, to demonstrate the existence of such difficulties, it was contended that the establishment of high water mark as the boundary would greatly obstruct the citizens of that State in the navigation of the Ohio river; that it would prevent the construction of wharves and other fixtures necessary to the free enjoyment of that important right, and that the adoption of such a boundary would carry with it “perpetual annoyance, collision, and never-dying controversies between the two States.” Now, in reply to this and all such speculative arguments, I submit that it is only necessary to refer to a subsequent part of the same counsel’s discussion, in which he contended that in the compact between Virginia and Kentucky, it is declared that the use and navigation of the Ohio river shall be free and common to the citizens of the United States, and that the respective jurisdictions of Virginia and Kentucky shall be concurrent with the States that may possess the opposite shores of the said river. The word shore, I know it is said, according to the legal writers, has a peculiar technical signification; in other words, that that term means the space of ground between high and low water mark. Such a meaning, I think, cannot be made properly to apply in this case, and can only be given when applied to watercourses in which there is a regular periodical ebb and flow of the tide. But besides this, to obviate the supposed inconveniences above referred to, it seems to me it is necessary to advert to one or two facts in this case, about which no difference of opinion exists. Ohio, I think, has both the right of jurisdiction and navigation. What possible inconvenience, *745 then, can attach to Ohio, upon the establishment of the high water mark, or the state of the water for the time being, as the proper boundary between the two States ? It results, it seems to me, from the very nature and characier of their relations, shewn by the history of this transaction, that although Virginia may be the owner of the soil of the shore on the northwest side of the river, yet Ohio would, despite the claims of Virginia, have the unquestionable right to establish such ports, and erect such wharves, buildings and other things as might be necessary for the carrying on of commerce and navigation on any parts of the shore that may be conveniently used for such erections; taking care to impede as little as possible Ohio river itself as a public highway: and this would leave Virginia, as before suggested, entitled to the soil, and Ohio to an easement over or connected with it, sufficient for all commercial purposes.
Respectfully differing as I do with the majority of the Court in this case, and believing that the prisoners ought to be punished for the offence charged against them in the indictment, I have deemed it proper to state briefly the grounds upon which my opinion is founded, and leave this deeply important and interesting subject to be more fully discussed and elucidated by some one or more of the Judges whose opinions have led them to the same result.
Fry, J.
The question before us is the construction of the deed of cession by Virginia of the northwestern territory. It is too late in the day to enquire into the right and title of Virginia to the lands ceded. It is beating the air to argue the question before a Virginia Court, sitting under her Constitution and laws. Congress having accepted that cession, and created the State of Ohio out of the lands ceded, the State of Ohio, as *746 claiming under the United States, is estopped to gainsay ^ . , r Tr* • • tu6 tltl6 01 V'lTg'lU'ld.
But what is the extent of the cession ? By her deed Virginia conveys to the United States “ all her right, title and claim, as well of soil as of jurisdiction, which the Commonwealth hath to the territory or tract of country, within the limits of the Virginia charter, situate, lying and being to the northwest of the river Ohio," to and for certain uses and purposes, and on certain conditions.
One of these conditions was “ that the territory ceded shall be laid out and formed into States containing a suitable extent of territory,” &c. “and that the States so formed shall be distinct republican States, and admitted members of the federal Union; having the same rights of sovereignty, freedom and independence as the other States.”
Congress afterwards passed the ordonnance establishing the northwest territory; and by her act of 1 Rev. Code, p. 41, Virginia confirmed the ordonnance, and therein designates the boundary of the eastern State to be created, as that of the Ohio." And by the act creating the State of Ohio and admitting her into the Union, she is bounded “south by the Ohio river.”
All these terms descriptive of boundary, I suppose to mean the same thing. They make the “ Ohio river” the boundary ; and the question is what is meant by the use of the word “river.”
Twenty-five years ago this was decided by the Supreme Court of the United States in the case of Handley's lessee v. Anthony, 5 Wheat. R. 374, to mean the permanent river; that is the river within low water mark. In that case it was held that the States of Ohio and Indiana extended to the low water mark of the river. The Chief Justice admits that the question was not without difficulty: but that the mind would find itself embarrassed with insurmountable difficulties in com *747 ing to any other conclusion. And though difficulties may arise from the boundaries adopted by him, I apprehend that equal, if not greater, would ensue from adopting any other.
This decision I consider one in pointy and not obiter as contended. It was necessary to decide the very question whether the river should be taken to mean the low water, or the ordinary or other height of the stream. The case shewed that the connexion between the upper and lower part of the river was formed only by the water of the river, and formed when the water was at its ordinary stage: that it required but ten feet above the lowest water, and that the river rose from forty to fifty feet. Nor did the fact that Indiana had always before exercised jurisdiction determine the case. The question was one of right between Indiana and Kentucky, raised by conflicting grants, and the Court was obliged to say whose grant was lawful. Kentucky by her very patent, the Court was bound to suppose, had assumed or asserted the right of domain and jurisdiction.
It is worthy of consideration whether, after twenty-five years, during which this decision of the Supreme Court has been supposed to give the law correctly, and been acted on by the people and Courts of Ohio, (see 11 Ohio E. 138,) and perhaps by the people and Courts of Virginia immediately bordering the Ohio river, it would be desirable or proper to attempt to go behind it and convict it of error; unless indeed the error were very manifest and looked us directly in the face. But this can hardly be predicated of the decision in question ; if it could of any decision ever made by that great Judge. For it is acknowledged that great difficulties surround the question, view it as we will; and the decision is chiefly assailed because of a supposed danger of collision which has not yet occurred, and which at the date of the cession was not probably anticipated, and therefore not guarded against. To the authority of this decision *748 we have now to add prescription. For twenty-five years since this decision, and for the whole period of her previous existence, Ohio has been in possession of the territory to low water mark. She has granted it by patent, and made every use of it which her wants and convenience required, and of which as property it was susceptible ; in short, has treated it as her domain, and extended over it her jurisdiction and laws. If this be not found in the verdict, it is to be found in part in the reports of the decisions of her Supreme Court, and is matter of notoriety and common observation.
It was said that there was no authority for the proposition of Judge Marshall, that a grant to a Sovereign, binding upon a river or arm of the sea where the tide ebbs and flows, would carry the grant to such Sovereign to low water mark or ebbtide : but it is fairly deduced, from what seems well settled, that a Sovereign owning the territory upon such river or sea, owns to such low water mark. “ It is admitted,” says Sir Matthew Hale, He Jure Maris, Harg. Law Tracts 12, “ that de jure communi, between high and low water mark doth prima facie belong to the King.” Again: “ The next evidence of the King’s right and property in the sea and the arms thereof, is his right of property to the shore, and marítima incrementa. The shore is that ground between the ordinary water and low water mark. This doth prima facie and of common right belong to the King, both in the shore of the sea and the shore of the arms of the sea.”
Now when one State grants to another State the soil and jurisdiction upon such a river or sea, or creates a new State or sovereignty bounded by such river or sea, where the tide ebbs and flows, does it not follow prima facie that this new sovereignty would enjoy, and be intended to enjoy, this right de jure communi of owning the shore and passing to low water or ebbtide ? Does it not follow, if no exception be made, from the character *749 of the grantee and the known prerogative or right incident to such grantee so situated ? Now in the case in question, the United States were the grantees, themselves sovereign, and expressly taking in trust to create a certain number of other sovereign States, having the great river Ohio for their boundary. This river, though not navigable in the sense of the common law, is so in fact, and the incidents of a navigable water at the common law apply to it upon every reason from which those incidents arise at the common law. That the rise and flow of the Ohio is casual and variable, instead of diurnal, and great instead of small or trifling, requires a fortiori the common law incident before mentioned pertaining to the Sovereign.
It could not be intended that a friendly Sovereign, granting to another friendly Sovereign territory so situate and bounded, designed without an express reservation, to restrict this common law incident, to retain the right to pass the river, and claim jurisdiction over the soil beyond. Such a jurisdiction would be too inconvenient to both parties to suppose it intended or desired.
The passage cited from Lord Hale proves also that the space between high and low water mark is the shore; and Virginia in her compact with Kentucky recognizes the States opposite to her on the Ohio as owning the shores of the river. See 5 Bacon 499, Wilson’s ed.
A distinction may well be taken between the grant of a patent to A for (say) 100 acres of land bounded south by the river, whilst Virginia retained the right of property and jurisdiction over the country itself, and the grant of the whole country to a sovereign nation. Adopting the analogy of the sea or tidewaters, the nation might be deemed to retain the right to the shore in the case of the private grant, and not to do so in the case of the grant to the nation. The latter might well be deemed to take the public rights to the shore, as appur *750 tenant to her empire in the same manner as they had been held by the granting Sovereign.
What is said (16 Peters 411) in the case of the oyster beds of New Jersey may be referred to as confirming this distinction, and the construction put on the Ohio grant, in 5 Wheat. “ It is not a deed conveying private property, to be interpreted by the rules applicable to cases of that description. It was an instrument upon which was to be founded the Constitutions of a great political community, and in that light it is to be regarded and construed.” Ch. Just. Taney, of the grant to the Duke of York, &c.
I conclude that Handley's lessee v. Anthony was rightly decided; that the shores of the river on the northwest side belong to Ohio ; and that the shores extend to low water mark. The claim to go to the high water, or the top of the bank on the other side, I take to be out of the question in such a river as the Ohio. For the greater part of the year, and for many years together the entire year, large spaces of land are left bare by the recession of the water, and devoted to various purposes of industry and art. Boats of all kinds are built upon it; coals are mined; railways for logs, coals and merchandize constructed; water pipes laid ; warehouses and perhaps other tenements built. Are all these, aud the numerous people connected with them, subject to the laws of Virginia ? Of what annoyance would such a jurisdiction be to the people of Ohio ? And how little less so to those of Virginia? With what convenience could Virginia exercise jurisdiction over a small strip of variable shore on the opposite side of a great river for more than 300 miles ? Such a jurisdiction would not be desirable ; and, as was said by Judge Marshall, could never have been intended. It is said (3 Wheat. 386) that the jurisdiction of a State is “coextensive with its territory, coextensive with its legislative power.” But though the soil and jurisdiction of *751 the shore, from low water to high, belongs to the State of Ohio, is this inconsistent with a jurisdiction in Virginia over the water of the shore, covering the same space and within the usual banks of the river ? May not Virginia hold divisum imperium with Ohio; so that when the river is full within its banks her jurisdiction goes to the edge of the stream, and when it recedes even to the lowest line, the jurisdiction of Ohio follows it ?
The terms of the grant are, that Virginia cedes her rights of “soil and jurisdiction to the territory or tract of country lying and being to the northwest of the river Ohio.” This means, we have seen, the permanent river, as to the rights of soil and property; and we have supposed such to have been the intent, from the character of the parties, the nature of the stream, the objects of the grant, and the convenience and necessities of the States to be created. But whilst the term “river” is thus limited, for the convenience and necessities of Ohio, when at low water, may it not also for the convenience and necessities of Virginia, when it is high, be enlarged, or rather allowed to retain its wonted and appropriate meaning? Give it its ordinary sense of “a large stream of water flowing in a channel towards the ocean,” (Webster); and whilst for the convenience and necessities of Ohio we bound it as the seasons bound it, so as to give her the soil and jurisdiction of a part of this channel, which the receding water allows her to use, and has made continuous with her other territory, let the seasons bound it also for Virginia in the same channel, as to the use and jurisdiction of the water, for equally cogent reasons. No violence to the words is done by this construction. Ohio terminates at the “ stream of water flowing in its channel,” and Virginia goes not beyond. She gives the soil to Ohio when deserted by the water, but in retaining the flowing stream she retains nothing which she had granted. The grant *752 should be construed for the benefit of both parties if it cau- If limited as to soil for strong reasons, it should not be limited to the prejudice of Virginia, further ^311 those reasons require. She does not grant the stream in terms; and no reasons of convenience or necessity compel us to construe it beyond the grant of the soil. She retains the river within its usual banks ,• but does not extend it to any thing beyond the rise of the water, or from which it may at any time recede.
There is a manifest convenience to Virginia in retaining jurisdiction over the river. As a practical question, it would be difficult to fix the precise limits in the stream of the low water line, during the flow of high or ordinary water. For the purposes of navigation, and for the service of civil and criminal process, it is important that jurisdiction should be general over the flow of the stream, within its banks. If it stop at any line within the stream, it might often present questions difficult and embarrassing, and perhaps not susceptible of solution.
If Virginia has not reserved this jurisdiction, she may be in a worse condition than Ohio. For if Ohio has exclusive jurisdiction over the water to the line of low water by her grant, and may take concurrent jurisdiction over the residue of the stream, without regard to low water, by virtue of the compact with Kentucky, as she has granted nothing to Virginia, then the latter State would have less jurisdiction on the river than Ohio. What is the precise meaning of “ concurrent jurisdiction,” I am not prepared to say. It strikes me as equivalent to “ common,” and that the “ river,” in connexion with “jurisdiction,” in the 7th'clause, is coextensive with the “river” in the beginning of the clause, in connexion with “use and navigation.” Virginia evidently supposed, at the time of her compact with Kentucky, that she had jurisdiction over the whole river. She could not have thought that there was any *753 part of it without her jurisdiction, and that she was making herself unequal with the other parties.
There are some analogies of the common law which favour the foregoing construction of the grant of Virginia, in severing the jurisdiction of the water and the land, between high and low water. (Saville 14; Inhabitants of Ipswich v. Brown, as cited Angel on Water Cour.; Coke Litt. 122 a.; 5 Co. R. 107, Constable's Case, Res. 2.) According to the case from Saville it would seem the water and soil of a river may be severed and belong to different persons ; that the ownership may be modified by agreement, as in the case of any other property. If it may be done by express words, I presume it may be inferred by construction and from circumstances, if adequate ; for it is matter of agreement or intent. And we have endeavoured to shew that the words of the grant admit of, and in the intendment of the parties require this severance. Constable's Case, 5 Co. 107. “ In this case it was resolved by the whole Court, that the soil on which the sea flows and ebbs, to wit, between the high water mark and the low water mark, may be parcel of the manor of a subject. 16 El. Dy. 326 b. acc. And so it was adjudged in Lacy's Case, Trim 25 El. in this Court. And yet it was resolved that where the sea flows and has plenitudinem maris, the admiral shall have jurisdiction of every thing done on the water, between the high water mark and low water mark, by the ordinary and natural course of the sea; and so it was adjudged in the said case of Lacy, that the felony committed on the sea ad plenitud, maris, between the high water and the low water mark, by the ordinary and natural course of the sea, the Admiral should have jurisdiction of; and yet where the sea ebbs, the land may belong to a subject, and every thing done on the land when the sea is ebbed shall be tried at the common law, for it is then parcel of the country, and infra corp. comitat. and therewith agrees, 8 E. 4—19 a—so *754 note that below the low water mark the Admiral has the sole and absolute jurisdiction ; between the high water mark and low water mark the common law and the Admiral have divisum imperium interchangeably, as is aforesaid, to wit, one super aquam, and the other super terrarn
The Courts of Ohio would seem to have admitted the construction for which I have been arguing : for whilst they have admitted and acted upon the case of Handley's lessee v. Anthony, (11 Ohio R. 138,) as to granting the soil to the low water mark, they have held that Virginia had jurisdiction over the whole river, that she had never granted it away, and that the same was concurrent with Ohio, by virtue of the compact with Kentucky. At least such was the decision of Judge Read of Cincinnati in the matter of the slave Watson, decided in the Supreme Court of Ohio at Cincinnati, Feb. 1845. Reported 2 West. Law Journal 279, 333. As the book is perhaps not to be found here, I may be excused for making a liberal extract.
It was a writ of habeas corpus. The return inter alia stated, the respondent was returning from Arkansas to Virginia with the slave ; that the steamer arrived in the river opposite Cincinnati, before day on the 31st January 1845, shortly after which Watson escaped; that he did not intend to permit Watson to land on the Ohio shore, but to transfer him to another boat and continue his journey without delay. And it was proved by witnesses that the boat arrived on the morning stated, before day; that about daylight she. was lying at the wharf, in the usual position of boats, her bow, about 20 or 30 feet from shore, made fast, and with her gang ways out and fires damped down; that she was from 25 to 50 feet within low water mark, measuring from her extreme outside.
After disposing of other parts of the argument, “ It is claimed,” says the Judge, “ that the Ohio river is the *755 boundary of Ohio, and that her jurisdiction consequently extends to the middle of the river; that Virginia and Kentucky have no right to claim to low water mark on the northwest side of the river; that the deed of cession of the northwest territory by Virginia could not be referred to as fixing the boundary line, as she had no right to the territory; that her original charter, conferring upon her a right to the lands, had been annulled by the Crown ; and that the French had seized the territory, and that it had only been regained by the hlood and common treasure of all the Colonies. It is quite too late to question the validity of the deed of cession ; the magnanimity and patriotism of the Old Dominion, the mother of States, was acknowledged, and the grant accepted, which estops all denial of the deed. The Courts of Ohio have recognized it in sustaining the titles of all the lands held by grant from Virginia in the military district.
“ By this deed the lands to the northwest of the Ohio river were ceded. What could have been the object of this phraseology ? Not, certainly, to retain the land in the bed of the river, and the islands in the stream. These would be of but trifling value compared with the great gifts already made. It unquestionably was to secure the full and free use of navigating the river, without hazarding any interference with her slaves navigating the river, by extending her jurisdiction over the water in the bed of the stream. She foresaw that difficulties would arise in respect to the jurisdiction over the river, by the States bordering on either side • and to put all dispute at rest, in her compact for setting off Kentucky as a State, she declares that the jurisdiction over the river should be common or concurrent to the States bordering upon it. Thus, for the service of civil and criminal process, it has been repeatedly decided by our Courts that the jurisdiction of Ohio and Kentucky was concurrent over the water of the river, without refer *756 eiice to high or low water mark. True, it has been decided, if a boat was attached to either shore, for the purpose of civil or criminal process, the jurisdiction was exclusive in the State to which it was attached. Whatever may be the boundary line for determining the rights of property, it is clear that the State of Ohio, for other purposes, has only a concurrent jurisdiction over the water within the banks of the river. But for the purposes of navigation, what is the jurisdiction upon the fiver ? The Ohio river is declared to be the common highway of the citizens of the United States. It is as free to the people of Kentucky and Virginia, as it is to the people of Ohio. But it is contended that the people of Ohio have the right to go down to the river and say to the people of Virginia and Kentucky, and all others, you shall not navigate the Ohio river this side of the middle of the stream with your slaves. If you come this side of the middle of the stream by accident, mistake, or are driven by the force of winds, or ice, or 'by distress, our laws authorize us to take from you your slaves. If you land upon our shore, or are driven there by any cause, your slaves are free. The effect of the whole matter is to deny the right to navigate the Ohio with a slave. For it is impossible oftentimes to avoid crossing the middle line of the river; sometimes to avoid collisions with other boats, driftwood, ice,—to avoid sandbars and ripples in low stages of water, and from many other causes which may arise. If this view could be sustained in law, it would be lamentable indeed. It would make the Ohio river in truth what it has been said that its name signifies—the river of Strife,—the war river—the river of blood. The people on the one side would attempt to free the slaves on the river: the people on the other would regard it as mere robbery, and would defend their property. But such is not the law. These difficulties were foreseen and guarded against by the foresight and wisdom of Virgi *757 nia; and she has, by the means above named, having dominion over the whole river, and the lands on both sides, secured to all, as far as their interests were concerned, a common jurisdiction. The jurisdiction is over the water itself and the bed of the stream, and not confined to fixed lines. Thus a master navigating the river, whilst upon the water, is within the jurisdiction of Virginia or Kentucky, for the purpose of retaining the right to his slave. And if the slave escape from the boat, it is an escape from the jurisdiction of one State into another, within the meaning of the Constitution of the United States, and Act of Congress.
“ This view is not opposed by the fact that the boat may, for the purposes of the ordinary navigation by the river, be made fast to the Ohio shore. The right to use the shore for the purpose of navigation, is incident to the right to navigate, and does not change the relation of master and slave.”
Thus it appears that the Courts of Ohio have admitted the jurisdiction of Virginia over the water of the Ohio, without regard to the low water line ; and that they claim and exercise a similar jurisdiction by virtue of the compact with Kentucky. They construe the term “river” in the compact, in connexion with “jurisdiction,” as embracing the whole water of the river within its banks. Of course they would extend this jurisdiction upon the Virginia shore as far as it may be carried on the Ohio shore.
But though Virginia has thus jurisdiction super aquam, it remains to enquire what is the extent or effect of this jurisdiction, and how it applies to the acts of the prisoners. It does not extend to the soil between high and low water. For example, Virginia could not grant the right to mine for coal or salt in it, or to build permanent structures upon it. When overflowed, her rights are those of the jus publicum, in a navigable water : her jurisdiction, like that of the Admiralty and *758 Common Law between high and low water. What are a^ her public rights in the “ overflow,” I will not attempt to define. Doubtless they extend to navigation, passing and repassing, and may embrace every use of the water, consistent with the ownership of the soil beneath in Ohio. 16 Peters 421, per Justice Thompson.
The jurisdiction may reach to whatever is afloat upon the water. Yet is there no exception to this, nor any limit to the jurisdiction, short of the utmost verge of the current ? Does it extend to vessels that have entirely passed low water and reached the shore of the Ohio, and there rest upon it, wholly above low water ? and to the acts of persons standing on the shore, at the verge of the water, but in it ?
• We have seen that Judge Reed states, it has been decided in Ohio, that if a boat be attached to either shore, for the purpose of civil and criminal process, the jurisdiction was exclusive in the State to which it was attached. He perhaps alludes to the case reported 1 West. Law Journal , wherein it was adjudged that an attachment by process from Kentucky, levied on a boat lying at the wharf at Cincinnati and fastened to the wharf, was not lawful. The boat was fully afloat, and lying with her stern at least (if I remember aright) below low water.
If the principle of this decision be correct, it seems to me to apply a fortiori to the case before us.
In examining it, we should consider that we are probably deciding the law for the Virginia shore, as well as that for the Ohio. Whatever rights we claim upon her shore, we have perhaps accorded to her upon our own by the grant of concurrent jurisdiction.
Was it well decided, and proper to be admitted and followed by this Court ?
It seems to me that the principle is expedient, necessary and well founded.
*759 Over the soil and territory of a State, its jurisdiction is admitted to be exclusive ; and so of every thing upon or within it. A ship or boat cannot, from its nature and uses, be brought further within a State than to rest upon its shore or be attached by wonted connexions or fastenings. In a river like the Ohio, binding a State, it cannot be otherwise brought within the State at all. Ships and boats are brought to the wharves and landings of each State, for trade and intercourse; and to hold them, when so brought, as not being in the sole jurisdiction of the State, is to affirm that they cannot be so brought at all, and that all vessels navigating the river, and their crews, cargoes and passengers, must be of necessity and at all times, at the shore or in the river, snbject to the jurisdiction of Virginia, and perhaps to that of Ohio also, under the grant of concurrent jurisdiction.
Jurisdiction is sometimes constructive, or beyond the actual territory, as in the case of a national ship or ambassador. So possession, as of a ship, may be constructive ; and the same may be said of the domicil. To attach a boat to the shore, there must bo an actual entry within the territory; a permission from the Sovereign: and so, to tread upon its soil: and though by controlling conventions or laws one may have a right to do either, yet the limits and jurisdiction of the State remain the same. Things permanently attached to the freehold partake of its dignity and attributes, by the common law. They become a part of it. For the purposes of jurisdiction may they not be equally a part, though attached pro tempore, as long as the connexion lasts? The dignity of the sovereignty seems to require it. It should cover with its aegis every thing that touches its soil, and impart its protection to all property and persons that reach it. Like the altar of refuge or sanctuary, whoever lays hold of it becomes a part of it, and is safe, though he stands without it.
*760 The peace and good order of the State, the due execution of its own polity and laws, require this construction. Collision and strifes must constantly arise from a contrary doctrine. If constables and sheriffs may levy attachments and executions upon property lying at our wharves, and there make arrests on mesne and final process, infinite mischiefs must ensue. The State is left naked at her borders and obnoxious to every intrusion.
States that are washed by the sea, the common highway of nations (as Ohio river is of the United States) enjoy, for their defence and safety, and as a consequence of their territorial domain, the exclusive sovereignty over the ports, harbours, gulfs (within the fauces terree) and the sea coast for a convenient distance from the land. This distance, I believe, is the range of cannon shot, or three miles. The nation in possession of the shore is at the same time sovereign of the adjacent sea to the above extent. It is deemed essential to the safety and welfare of nations, and to the due execution of their revenue and other laws. Every port is considered as belonging to the State in which it is situate, and subject to the ruling power.
Is there no analogous principle for a State bounded by a river ?
It seems to me there should be, and that it should go as far at the least as the decision of the Court in Ohio went. If the line of common jurisdiction upon a river can be passed at all, and that of sole jurisdiction begin, it must be at the point where the shore of the State is reached in the manner stated.
It is no answer to say that the principle may be abused or perverted; as that one might swing a boat, attached to a rope, out into the stream, or even near the opposite shore,, to annoy or injure the traders upon the river. Such a case would be extreme, and the connexion merely colourable and mala fide, and as such disregarded.
*761 The case of Stryker v. The City of New York, reported in 19 John. R. 179, seems contra. But it is to be observed that this case presented the question as between two counties within the same State. The great principle, as derived from the eminent domain and as applicable to nations, was not involved. The same reasons did not and could not exist. The difference between the parties may warrant a different conclusion. It were unworthy to liken the jurisdiction and authority of a nation to that of a county. The difference in the parties here may warrant a different’ conclusion, as we have seen it does in the case of grants to individuals and nations. But even in this case it may be doubted how the decision would have been, had the boat been resting, in any part of her, above the low water in King's county. The whole boat Iriy below low water, and without the boundary of King's county.
Apparently, the distinction before alluded to between the admiralty and the common law will apply here. Of wreck, the common law had jurisdiction; of flotsam, the admiralty. To constitute a legal wreck, the goods must come to land ; quicquid ad terrain venit. Flotsam is where they continue floating on the surface of the waves between high and low water. 1 Bl. Com. 292. 5 Bacon, title Prerogative. Now if a boat or other thing be resting on the soil or beach, the property of another; if it be not actually floating upon the surface, but fixed or stable on the sands or the shore between high and low water, like wreck; it would seem the jurisdiction of the shore or of the soil would attach to it. This would fully cover the case of the canoe and of the defendants under consideration ; though it would leave the case of a boat wholly floating below or above low water, and only attached by a cable or the like, to the effect of the arguments urged to shew it, even then, constructively brought to the land or shore, and a part of it.
*762 But whether a boat so afloat and fastened be within * • . • the exclusive jurisdiction or not, it seems to me that a citizen of Ohio standing upon her soil above low water, or a boat resting on her shore above the same, is within the jurisdiction of Ohio, and so the locus delicti without the county of Wood; and that consequently there should be judgment for the prisoners.
In approving the decision in 5 Wheaton, and yielding the soil and jurisdiction to low water to Ohio, with the consequences stated, and attempting to reconcile it with, the jurisdiction of Virginia over the water that covers that soil, I may possibly have erred. They may be inconsistent and not to be reconciled. I have thought otherwise ,• and, in this respect, have agreed with several of my brethren. I must admit, however, that I do not feel the same confidence in the latter branch of this opinion as I do in the first. I yield to the authority, justness and propriety of the decision in 5 Wheaton, and. every necessary consequence; but have not supposed there was any necessary conflict between that decision, and the jurisdiction of Virginia as contended for.
However, from the difficulty of the whole subject,, and the diversity of views, I own I feel great diffidence in all the opinions I have advanced.

 Note by the Judge. It will be readily seen that Virginia in reserving the river to herself) must of necessity have included the opposite bank to high water mark, because, in setting apart the southeastern shore and the water on the opposite shore to the lowest mark, this could not be the river, or the whole river, but only an indeterminate and undetermined part; for in the very nature of the river under discussion, the water never recedes to any given point any two years alike. She must have contemplated a reservation of the whole river, in order to grant the right of navigation, which she could not have done unless the exclusive property in and jurisdiction over the entire river had been hers.

 Note hy the Judge. This was written before the late treaty between the United States and Great Britain.